EARL G. HAWKINS AND ELVA L. HAWKINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
HAWKINS v. COMMISSIONER
Docket Nos. 6256-70, 1486-72, 1499-72, 6213-76.
United States Tax Court
T.C. Memo 1987-91; 1987 Tax Ct. Memo LEXIS 87; 53 T.C.M. (CCH) 138; T.C.M. (RIA) 87091; February 12, 1987. *87 During 1965, petitioner-husband received in a corporate reorganization all the preferred stock of a construction company. The company defaulted on two loans in 1969 and 1971, which were guaranteed by petitioner-wife. Petitioner-wife repaid the principal and interest due on the loans. Petitioners also made various advances to the company during 1970 through 1974. During 1965 through 1974, the company made various large transfers to petitioners' sons; none of these transfers was repaid during those years. Held: (1) Neither petitioner-husband's stock nor any debts of the corporation to petitioners became worthless during any of the years before the Court (1965 through 1974), and so no loss or bad debt deductions are allowable. Secs. 165(g) and 166(d), I.R.C. 1954. (2) The 1971 loan guarantee payment by petitioner-wife constituted either a contribution to the capital of the company or an indirect gift to petitioners' sons. Petitioners are entitled to deduct the interest portion of this loan guarantee payment. Sec. 163, I.R.C. 1954. From 1971 through 1974, petitioners transferred various amounts to their sons. (3) Petitioners have failed to prove that the transfers resulted in bona *88 fide debts, or that the debts, if any, became worthless in 1974, and so no bad debt deductions are allowable for 1974. Sec. 166(d), I.R.C. 1954. Petitioners claimed a casualty loss deduction for 1968, a sales tax deduction for 1970, and a net operating loss carryover deduction for 1974. (4) Petitioners have failed to prove that they are entitled to the casualty loss, sales tax, and net operating loss deductions. Secs. 165, 164, and 172, I.R.C. 1954. Earl G. Hawkins, pro se. Robert L. Archambault, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners as follows: Docket No.
Year
Deficiency
6256-70
1965
$1,004.20
1966
13,806.00
1486-72
1967
7,077.07
1499-72
1968
2,195.00
1969
102,753.00
6213-76
1970
1,110.92
1971
26,667.07
1972
3,383.43
1973
186.40
1974
1,699.25
These cases have been consolidated for trial, briefs, and opinion. After concessions by both sides, the issues for decision [1] are as follows: (1) Whether, to what extent, and for what years petitioners are entitled to a deduction for worthless stock under section 165, [2] or to nonbusiness bad debt deductions under section 166, as a result *89 of petitioners' dealings with Parsons Corporation; (2) Whether petitioners are entitled to an interest expense deduction for 1971 under section 163; (3) Whether petitioners are entitled to nonbusiness bad debt deductions for 1974 under section 166 with respect to various transfers made to their sons; (4) Whether petitioners are entitled to a casualty loss deduction for 1968 under section 165; (5) Whether petitioners are entitled to a sales tax deduction for 1970 under section 164 in excess of the amount allowed by respondent; and (6) Whether petitioners are entitled to a net operating loss carryover deduction for 1974 under section 172. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated *90 exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, petitioners Earl G. Hawkins (hereinafter sometimes referred to as "Earl") and Elva L. Hawkins (hereinafter sometimes referred to as "Elva"), husband and wife, resided in Douglas County, Nebraska. Before August 1960, Parsons Construction Company, Inc. (hereinafter sometimes referred to as "Old Parsons"), was actively engaged in the construction business. Old Parsons was owned and operated by Earl, his sons, William C. Hawkins (hereinafter sometimes referred to as "William") and Earl G. Hawkins, Jr. (hereinafter sometimes referred to as "Earl, Jr."), Earl's brother, Kenneth J. Hawkins (hereinafter sometimes referred to as "Kenneth"), and Kenneth's son, Fred H. Hawkins (hereinafter sometimes referred to as "Fred"); they held Old Parsons' outstanding stock (all common stock) as shown in table 1. Table 1
Owner
Shares
Basis
Earl
113 $11,300
William
25
2,500
Earl, Jr.
25
2,500
Kenneth
138 13,800
Fred
25
2,500
Over a period of time immediately before August 1960, personnel problems developed at the managerial level of Old Parsons which precipitated a decision by the two families operating Old Parsons to *91 separate and operate their own construction businesses. A plan to reorganize Old Parsons was adopted at a meeting of Old Parsons' board of directors on August 24, 1960. Pursuant to the reorganization plan, two corporations were formed on or about September 1, 1960, in order to operate separate construction businesses. Earl, William, and Earl, Jr., organized Parsons Corporation (hereinafter sometimes referred to as "New Parsons"). Kenneth and Fred organized Hawkins Construction Company. Each of these corporations was authorized to issue 4,000 shares of preferred stock at $100 par value each, and 1,000 shares of common stock at $100 par value each. New Parsons issued 1,000 shares of its common stock to Earl on September 1, 1960, in exchange for which Earl transferred to New Parsons $100,000 ($81,500 in cash and $18,500 in fair market value of equipment). New Parsons issued 4,000 shares of its preferred stock to Old Parsons on or about September 1, 1960, in exchange for which Old Parsons transferred to New Parsons $400,000 ($236,749.75 in cash and $163,250.25 in fair market value of equipment and a life insurance policy). On August 24, 1960, Old Parsons' shareholders amended the *92 Articles of Incorporation to authorize the issuance of 1,000 shares of Class A common stock and 1,000 shares of Class B common stock. On September 30, 1960, new Class A common stock of Old Parsons was issued to Earl, William, and Earl, Jr., in exchange for their Old Parsons common stock on a share-for-share basis. On the same day, new Class B common stock of Old Parsons was issued to Kenneth and Fred in exchange for their Old Parsons common stock on a share-for-share basis. Immediately after these exchanges, the Old Parsons outstanding stock was held as shown in table 2. Table 2
Owner
Class
Shares
Basis
Earl
A
113 $11,300
William
A
25
2,500
Earl, Jr.
A
25
2,500
Kenneth
B
138 13,800
Fred
B
25
2,500
On December 30, 1960, Earl disposed of his 1,000 shares of New Parsons common stock by transferring 500 shares to Earl, Jr., and 500 shares to William. The stock certificate representing the 25 Class A Old Parsons shares owned by Earl, Jr., contains the following endorsement: For Value Received, I hereby sell, assign, and transfer unto Earl G. Hawkins 25 (twenty-five) Shares of the Capital Stock represented by the within Certificate and do hereby irrevocably constitute and appoint the Secretary of [Old Parsons] *93 to transfer the said Stock on the books of the within named Corporation with full power of substitution in the premises. Dated 30th December 1960 A substantially similar endorsement with the same date appears on the stock certificate representing the 25 Class A Old Parsons shares owned by William. On or about December 4, 1963, a stock certificate representing the 50 Class A shares of Old Parsons stock owned by Earl, Jr., and William was issued to Earl. After this transfer [3], Old Parsons, outstanding stock was held as shown in table 3. Table 3
Owner
Class
Shares
Earl
A
163
Kenneth
B
138
Fred
B
25
On November 30, 1965, Old Parsons was voluntarily dissolved by written consent of all of its shareholders pursuant to Nebraska law. On November 30, 1965, in accordance with Old Parsons' Articles of Incorporation, the 4,000 shares of New Parsons preferred stock held by Old Parsons before dissolution were distributed to Earl, the *94 holder of all the Old Parsons Class A common stock at the time of Old Parsons' dissolution. Immediately after the dissolution of Old Parsons, the New Parsons outstanding stock (all of it being voting stock) was held as shown in table 4. Table 4
Owner
Class
Shares
Earl
Preferred
4,000
Earl, Jr.
Common
500
William
Common
500
Holders of New Parsons preferred stock are entitled to dividends of $5 per share per year, payable in cash, property, or additional shares of preferred stock, at the discretion of the board of directors. During 1960 through at least 1974, no dividends were declared or paid with respect to the 4,000 shares of New Parsons preferred stock. As of November 30, 1965, arrearages in the payment of dividends to the preferred shareholders of New Parsons amounted to $100,000. On any dissolution, liquidation, merger, or consolidation of New Parsons in which there is a distribution of capital, the holders of New Parsons preferred stock are entitled to $100 per share plus unpaid dividends, before any amount is paid or property distributed to holders of New Parsons common stock. During the years in issue, Earl was chairman of New Parsons' board of directors, William was president and treasurer, *95 and Earl, Jr., was vice-president and secretary. Elva was never an employee, officer, director, or shareholder of New Parsons. On or about January 28, 1963, petitioners, William, William's wife, Earl, Jr., and Earl, Jr.'s wife executed an agreement entitled "GUARANTY" (hereinafter sometimes referred to as "the Guaranty") with the United States National Bank of Omaha (hereinafter sometimes referred to as "the Bank"), in which they jointly and severally guaranteed payment to the Bank of all existing and future debts from New Parsons to the Bank, up to a total of $300,000. On or about April 1, 1969, New Parsons owed the Bank $280,000, plus interest, on various loans obtained by New Parsons in prior years. These loans were secured by the Guaranty. On April 1, 1969, Elva pledged various securities to the Bank to further secure these debts of New Parsons. On April 1, 1969, New Parsons borrowed an additional $100,000 from the Bank, secured by New Parsons' promissory note and various additional securities pledged to the Bank by Elva. After June 2, 1969, New Parsons was in default on its payments to the Bank on the $280,000 debt. On or about July 8, 1969, the Bank accelerated the maturity *96 date of the $100,000 April 1, 1969, loan. On various dates in July, August, and September 1969, the Bank sold the securities that had been pledged by Elva, and applied the proceeds as payment on New Parsons' $394,366.61 of debts to the Bank ($380,000 applied to principal and $14,366.61 applied to interest). The Guaranty was still in effect when the Bank sold Elva's securities and used the proceeds thereof to pay New Parsons' debts. On May 1, 1970, New Parsons borrowed $115,000 from the Bank, secured by New Parsons' promissory note and securities pledged to the Bank by Elva. On or about September 1, 1971, the Bank sold the securities pledged by Elva and applied the proceeds as payment on New Parsons' $128,102.53 debt to the Bank ($115,000 applied to principal and $13,102.53 applied to interest). Earl borrowed $67,000 from the West Omaha National Bank, on the dates and in the amounts shown in table 5. These loans were secured by personal promissory notes and pledged securities. Earl transferred all the proceeds of the loans to New Parsons. Table 5
Date
Amount
November 4, 1970
$40,000
January 21, 1971
10,000
March 21, 1971
8,500
May 28, 1971
8,500
Total
$67,000
At some time between March 1, *97 1973, and February 28, 1974, [4] Earl borrowed $15,000 from the Bank, and transferred the proceeds of the loan to New Parsons. The loan was repaid in September 1974 with the proceeds of a sale of stock owned by Elva. In addition, petitioners made cash transfers in excess of cash withdrawals to New Parsons as shown in table 6. Table 6
New Parsons Taxable Year
Amount
1970
1971
$ 2,500.00
1972
32,478.52
1973
69,687.00
1974
31,955.68
1975
20,128.07
$156,749.27
The amounts shown in table 6 include at least $69,687 that was transferred by Earl from petitioners' personal checking account. The various transfers by Earl and Elva to New Parsons described supra are shown in the books of New Parsons as accounts payable, in part to Earl and in part to Elva, as shown in table 7. Table 7
Petitioners Payables
Account
New Parsons Taxable Year
Balances at End of Year
Total
Earl
Elva
1969
1970
$394,366.61
$394,366.61
1971
446,866.61
446,866.61
1972
$26,818.97
[5] 685,930.08
712,749.05
1973
26,818.97
[5] 739,675.76
766,494.73
1974
24,693.34
786,631.44
811,324.78
1975
24,693.34
806,759.51
831,452.85
The *98 accounts payable shown for Earl include an interest accrual of $3,324.45, and the proceeds of the March 21, 1971, and May 28, 1971, loans shown in table 5, supra. The accounts payable shown for Elva include an interest accrual of $85,960.94, the $394,366.61 1969 loan payment, the $128,102.53 1971 loan payment, the proceeds of the November 4, 1970, and January 21, 1971, loans shown in table 5, supra, and the 1973 and 1974 transfer of $15,000 to New Parsons by Earl. Elva received payments from New Parsons of $6,000 and $2,000 on February 14, 1973, and May 18, 1973, respectively, constituting repayments of loans. Elva received no other payments relative to the amounts shown as accounts payable on the books of New Parsons. On or about October 25, 1966, New Parsons entered into an Agreement with Sunset Plaza, Inc. (hereinafter sometimes referred to as "Sunset"), whereby New Parsons agreed to construct a shopping center in Norfolk, Nebraska. Total billings by New Parsons with respect to the Sunset shopping center *99 construction project, as reflected in the books and records of New Parsons, amounted to $2,567,790.08. On or about March 3, 1969, New Parsons instituted foreclosure proceedings against Sunset in the State District Court of Madison County, Nebraska. On May 15, 1969, Sunset filed a voluntary petition under Chapter X of the Bankruptcy Act in the United States District Court for the District of Nebraska. In December 1969, when Sunset was adjudicated a bankrupt [6] *100 , Sunset owed New Parsons $694,664.06 against which New Parsons owed subcontractors and material suppliers $431,252.32. Sunset also owed others more than $1,650,000 in first mortgages, real estate taxes, past mortgage payments due, and miscellaneous items. On or about January 23, 1970, New Parsons filed a proof of claim [7] against Sunset with the United States District Court in the total amount of $788,053.29. This amount includes the $431,252.32 New Parsons owed to subcontractors and material suppliers, $260,403.51 for overhead, profits, and costs advanced by New Parsons, $25,024.76 for legal and accounting fees, and $71,372.70 for interest. On or about August 6, 1971, the bankruptcy estate of Sunset assigned accounts receivable of Sunset totalling $74,396.11 to New Parsons, paid $362,713.02 to certain secured subcontractors and material suppliers of New Parsons, and paid $29,750 to New Parsons. Subsequently, the bankruptcy estate paid the balance of the claims of the secured subcontractors and material suppliers of New Parsons. From its inception, New Parsons has used for tax purposes the completed contract method of accounting for reporting profit and losses on construction contracts. The contract price and percentage of completion of uncompleted contracts of New Parsons as of February 28, 1966, as reflected in the books and records of New Parsons, *101 are shown in table 8. Table 8
Percentage of
Contract
Price
Completion
Lippold Building
$1,474,708.00
88
Convent
2,307,586.57
41
Valley View
440,000.00
30
Omaha Steel
6,337.08
[8] 100   Roffman
3,820.00
Lippold
880.83
Omaha Steel
232,440.00
1 $4,465,772.48
New Parsons' tax returns show gross receipts and taxable income (or operating losses) prior to the application of any net operating loss deductions, in the amounts shown in table 9. Table 9
New Parsons Taxable Year
Gross Receipts
Taxable Income (Loss)
1961
$162,553.35
($17,523.92)
1962
2,847,597.86
(226,108.44)
1963
3,184,467.61
(164,198.95)
1964
2,539,542.39
14,463.03 1965
2,658,765.72
(5,863.34)  1965
586,053.07
(201,735.53)
1966
52,378.24
(44,372.64) 1967
2,128,027.32
98,725.33 1968
3,492,539.22
(256.40)    1969
2,650,928.42
(265,405.40)
1970
791,109.27
(88,179.68) 1971
12,988.28
(143,413.45)
1972
25,573.41
225,844.70
1973
4,127.02
(22,441.72) 1974
16,786.45
(35,699.13) New Parsons' tax returns show dispositions of depreciable property with gains and losses as shown in table 10. Table 10
New Parsons Taxable Year
Adjusted Basis
Gain or (Loss)
1966
$200.00
1968
$1,139.73
5,650.27
1970
[9] *102 61,463.67
1971
[10]
36,236.83
1972
[11]
[11]
1973
[12]
[12] 21,000.00
1974
[13] *103 939.92 New Parsons claimed bad debt deductions of $260,000 and $152,000 on its tax returns for its taxable years 1969 and 1970, respectively, relating to its accounts receivable from Sunset. New Parsons reported a bad debt recovery of $337,000 on its tax return for its taxable year 1972, relating to its recovery of certain amounts from the bankruptcy estate of Sunset. New Parsons' tax returns for its taxable years 1962 through 1971 each show deductions for compensation paid to William and Earl, Jr., as officers of New Parsons. New Parsons' tax returns for its taxable years 1972 through 1974 do not show deductions for compensation paid to officers. New Parsons' tax returns show automobile expenses, promotion expenses, and total business expense deductions (excluding interest) in the amounts shown in table 11. Table 11
New Parsons
Automobile
Promotion
Other
Total
Taxable Year
Expenses
Expenses
Expenses
Expenses
1971
$10,812.31
$ 7,192.88
$ 70,055.98
$ 88,061.17
1972
6,792.18
2,275.60
43,703.17
52,770.95
1973
10,068.44
4,993.29
36,743.79
51,805.52
1974
10,767.88
4,009.74
23,975.28
38,752.90
$38,440.81
$18,471.51
$174,478.22
$231,390.54
*104 New Parsons' tax returns show the asset and liability balances shown in table 12. Table 12
New Parsons Taxable Year
[14] 2/28/65 [14] 11/30/65 1966
ASSETS
Cash
$ 14,566.82 $ 157,298.94 $ 62,764.62 [15] Trade Notes & Accounts Receivable
804,127.66 663,578.55 703,631.11 Allowance for Bad Debts
(5,500.00)
(5,500.00)
(5,500.00)
Building & Equipment
545,547.66 522,049.40 522,903.56 Accumulated Depreciation
(297,996.90)
(314,461.71)
(325,408.26)
Land
59,341.90 59,341.90 59,341.90 [15] Other Assets 39,448.84 48,777.94 3,314.00 $1,159,535.98 $1,131,085.02 $1,021,046.93 LIABILITIES AND STOCK-
HOLDERS' EQUITY
Accounts Payable
713,806.32 807,640.06 585,844.02 Notes & Bonds Payable
417,091.39 350,437.02 329,884.78 Other Liabilities
10,281.27 12,504.39 14,268.08 Deferred Income
176,069.49 Loans from Shareholders
Capital Stock
500,000.00 500,000.00 500,000.00 Retained Earnings
(481,643.00)
(539,497.35)
(585,019.44)
$1,159,535.98 $1,131,084.12 $1,021,046.93 Table 12
New Parsons Taxable Year
1967
1968
1969
ASSETS
Cash
$ 13,371.11 $ (1,039.80)
$ (27,439.59)
[15] Trade Notes & Accounts Receivable
708,155.68 929,283.25 1,532,010.24 Allowance for Bad Debts
(5,500.00)
(8,000.00)
(268,000.00)
Building & Equipment
524,973.56 513,928.93 514,779.68 Accumulated Depreciation
(368,200.91)
(382,791.36)
(409,014.36)
Land
28,075.10 28,075.10 28,075.10 n15Other Assets 101,514.33 85,664.51 66,030.62 $1,002,388.87 $1,165,120.63 $1,436,441.69 LIABILITIES AND STOCK-
HOLDERS' EQUITY
Accounts Payable
488,506.60 825,378.05 1,288,797.12 Notes & Bonds Payable
298,401.19 292,489.63 369,950.98 Other Liabilities
28,322.44 28,887.05 24,733.09 Deferred Income
162,370.38 Loans from Shareholders
Capital Stock
500,000.00 500,000.00 500,000.00 Retained Earnings
(475,211.74)
(481,634.10)
(747,039.50)
$1,002,388.87 $1,165,120.63 $1,436,441.69 *105 Table 12
New Parsons Taxable Year
1970
1971
1972
ASSETS
Cash
$ 2,359.16 $ (2,085.63)
$ (1,463.64)
[15] Trade Notes & Accounts Receivable
1,038,684.80 1,008,598.06 691,522.56 Allowance for Bad Debts
(420,000.00)
(404,059.63)
(67,059.63)
Building & Equipment
358,972.96 329,984.28 319,551.66 Accumulated Depreciation
(341,206.85)
(324,832.82)
(306,989.09)
Land
n15Other Assets 116,580.66 107,071.83 100.00 $755,390.73 $714,676.09 $635,661.86 LIABILITIES AND STOCK-
HOLDERS' EQUITY
Accounts Payable
$631,390.15 $583,326.15 $140,968.58 Notes & Bonds Payable
46,245.87 151,245.87 36,245.87 Other Liabilities
13,854.91 6,023.13 5,578.35 Deferred Income
n16Loans from Shareholders 399,118.94 452,713.57 705,656.99 Capital Stock
500,000.00 500,000.00 500,000.00 Retained Earnings
(835,219.18)
(978,632.63)
(752,787.93)
$755,390.73 $714,676.09 $635,661.86 Table 12
New Parsons Taxable Year
1973
1974
ASSETS
Cash
$ (1,624.78)
$ (3,755.82)
[15] Trade Notes & Accounts Receivable
707,067.05 716,064.22 Allowance for Bad Debts
(67,059.63)
(67,059.63)
Building & Equipment
17,962.37 17,962.37 Accumulated Depreciation
(15,399.80)
(15,399.80)
Land
n15Other Assets 100.00 100.00 $641,045.21 $647,911.34 LIABILITIES AND STOCK-
HOLDERS' EQUITY
Accounts Payable
$131,775.47 $129,254.69 Notes & Bonds Payable
9,245.87 9,245.87 Other Liabilities
416.76 672.95 Deferred Income
[16] *107 Loans from Shareholders 775,336.76 820,166.81 Capital Stock
500,000.00 500,000.00 Retained Earnings
(775,729.65)
(811,428.98)
$641,045.21 $647,911.34 *106 Based on the amounts shown in table 12, supra, New Parsons' net assets exceeded its liabilities (exclusive of debts to shareholders and shareholders' equity) by the amounts shown in table 13. Table 13
New Parsons
Taxable Year
1970
1971
1972
1973
1974
Assets
$755,390.73
$ 714,676.09 $635,661.86
$641,045.21
$647,911.34
Less Liabilities other than to shareholders
691,490.93
740,595.15 182,792.80
141,438.10
139,173.51
Net assets available to shareholders
$63,899.80
$ (25,919.06)
$452,869.06
$499,607.11
$508,737.83 New Parsons' books reflect various notes and accounts receivable from William and Earl, Jr. The cumulative balance of these receivables, at the end of each taxable year of New Parsons, is shown in table 14. Table 14
New Parsons Accounts
New Parsons Taxable Year
Receivable
William
Earl, Jr.
1965
$ 30,186.56
$ 33,937.68
1966
41,255.79
45,926.71
1967
54,434.58
75,030.41
1968
68,403.54
89,226.95
1969
88,344.50
109,878.02
1970
97,224.42
149,054.77
1971
119,790.07
180,247.44
1972
145,682.95
189,643.44
1973
191,325.32
189,643.44
1974
220,118.38
189,643.44
1975
228,251.96
189,643.44
1970
$ 24,987.65
$ 19,484.18
Total, Feb. 28, 1975
$253,239.61
$209,127.62
The amounts shown in table 14 reflect withdrawals from New Parsons and charges *108 for services rendered by New Parsons to William and Earl, Jr., including construction work performed on the personal residences of William and Earl, Jr. The amounts shown as notes receivable reflect a distribution in February 1970. During the years in issue, neither William or Earl, Jr. paid any interest with respect to the amounts shown in table 14. Between May 5, 1971, and December 27, 1974, petitioners transferred $19,161 [17] from their personal checking account to William, of which $7,911 was transferred during 1974. [18] *109 Between May 26, 1971, and November 2, 1971, petitioners transferred $8,700 from their personal checking account to Earl, Jr. On their 1965 tax return, petitioners claimed a long-term capital loss deduction of $111,300. This deduction relates to the November 30, 1965, distribution by Old Parsons of 4,000 shares of preferred stock of New Parsons to Earl in exchange for his 163 shares of Class A stock of Old Parsons. Petitioners described the transaction on their 1965 tax return as "Liquidation: Parsons Const. Co." and reported the gross sales price as zero. The claimed loss gave rise to capital loss carryover deductions on petitioners' 1966 and 1967 tax returns. Respondent disallowed the loss deduction (and the resulting capital loss carryover deductions) on the ground that petitioners "have failed to establish that such stock became worthless within the taxable year or any other year." On their 1968 tax return, petitioners claimed a casualty loss deduction of $921. Petitioners described the transaction on their 1968 tax return as "Roof damage -- August '68 Tornadoes -- Casualty damage." Respondent disallowed the loss deduction on the ground that "the *110 loss was equal to the insurance proceeds received." On their 1969 tax return, petitioners claimed a long-term capital loss deduction of $394,367. This deduction relates to the $394,367 paid to the Bank in 1969 on the indebtedness of New Parsons. Petitioners described the transaction on their 1969 tax return as "Sale of above securities by U.S. Nat. Bank pledged as Security Collateral on Parsons Corp. Bank Loan default." The claimed loss gave rise to capital loss carryover deductions on petitioners' 1970 and 1971 tax returns. Respondent disallowed the loss deduction (and the resulting capital loss carryover deductions) on the ground that petitioners "have not established that the debt had become worthless within the taxable year." On their 1970 tax return, petitioners claimed a general sales tax deduction of $646. Respondent allowed $235.20 of this deduction and disallowed the remaining $410.80. On their 1971 tax return, petitioners claimed, as short-term capital losses, bad debt deductions of $115,000 and $67,000. The $115,000 bad debt deduction relates to the $115,000 paid to the Bank in 1971 on the principal portion of the indebtedness of New Parsons. The $67,000 bad debt deduction *111 relates to the loans shown in table 5, supra. The claimed losses gave rise to capital loss carryover deductions on petitioners' 1972, 1973, and 1974 tax returns. Respondent disallowed the loss deduction (and the resulting capital loss carryover deductions) on the grounds that petitioners "have not established that a debtor-creditor relationship was created by the transfer. Said transfer consummated gifts to your sons, William C. Hawkins and Earl G. Hawkins, Jr., and/or represented contributions of capital to Parsons Corporation. In the event a debt was established by the transfer, it was worthless when made or, if not then worthless, you have not established that the debt became worthless in the taxable year 1971 or any other taxable year." On their 1971 tax return, petitioners also claimed an interest expense itemized ("below-the-line") deduction of $13,103. Petitioners described the item on their 1971 tax return as "U.S. Nat Bank (Loan)". Respondent disallowed the deduction on the ground that "it has not been established that the interest was paid on your indebtedness." On their 1971 tax return, petitioners reported a $1,000 loss from the sale or exchange of capital assets, *112 adjusted gross income of $33,307, itemized deductions of $36,573, eight personal exemptions totaling $5,400, and taxable income of ($8,936). On their 1974 tax return, petitioners claimed a deduction of $8,936 which they described as "1971 Prior year loss carried forward". Respondent disallowed the loss deduction on the ground that petitioners "did not modify the loss by the net capital loss on [sic] the deductions claimed for personal exemptions." On their 1974 tax return, petitioners also claimed, as short-term capital losses, bad debt deductions of $15,000, $68,563, $24,693, $8,700, and $19,711. The $15,000 bad debt deduction relates to the $15,000 transferred by Earl to New Parsons between March 1, 1973, and February 28, 1974. The $68,563 bad debt deduction is identified on the tax return as loans to New Parsons by Elva. The $24,693 bad debt deduction relates to the amounts shown on the books of New Parsons as accounts payable to Earl. (See table 7, supra.) The $8,700 and $19,711 bad debt deductions are identified on the tax return as loans to Earl, Jr., and William, [19] respectively. Respondent disallowed deductions for all five items on essentially the same grounds that he *113 gave with regard to the 1971 bad debt deductions, discussed supra.
* * * Earl's New Parsons preferred stock did not become worthless during any of the years before the Court. New Parsons' debts to Earl and Elva did not become worthless during any of the years before the Court. OPINION As a preliminary matter, we consider petitioners' contentions that the notices of deficiency in docket Nos. 6256-70 (relating to 1965 and 1966) and 6213-76 (relating to 1970-1974) are invalid, and that the burden of proof should be shifted to respondent. Petitioners contend (1) that the Internal Revenue Service (hereinafter sometimes referred to as "the Service") personnel involved in issuing the notices failed to give proper consideration to the records presented to them; (2) that the Service changed its position on the worthlessness of the New Parsons stock as the audit resulting in the initial notice progressed; (3) that the Service failed to follow its own procedures in issuing the later notice; and (4) that as a result of these actions petitioners' constitutional *114 rights were violated. Firstly, by challenging the factual basis for the notices of deficiency, petitioners are, in essence, asking the Court to "look behind" the notices of deficiency. This Court proceeds on the basis of the notice of deficiency and a trial de novo (e.g., Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974)), and we see no compelling reasons to depart from this practice in the instant cases. Secondly, the worthlessness of the New Parsons stock was apparently placed in issue after petitioners had appealed a revenue agent's determination on another question to respondent's district conference staff. Respondent is not precluded from raising new issues in such circumstances. Carl T. Miller Trust v. Commissioner,76 T.C. 191, 201 (1981). Thirdly, absent extremely unusual circumstances not present in the instant cases, even if respondent failed to follow his own administrative procedures, that does not rise to the level of a violation of the due process clause of the Constitution. Riland v. Commissioner,79 T.C. 185, 200-202 (1982), and cases there cited. We conclude that petitioners' constitutional rights have not been violated, and we decline to hold the *115 notices of deficiency invalid or to shift the burden of proof to respondent. Petitioners have the burden of showing that respondent's determinations as to matters of fact in the notices of deficiency are erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).[20] As a second preliminary matter, we consider petitioners' contention that they were not able to satisfy their burden of proof on a number of issues because they were "estopped" from offering evidence on those issues at trial due to this Court setting a time limitation on the length of the trial. Petitioners did not raise this contention at trial, nor do petitioners suggest that some evidence was not available to them in ample time to present it at the trial. Petitioners were given ample time by this Court to prepare for and conduct the trial. Several continuances were granted to petitioners, and petitioners were repeatedly informed by this Court of their burden of proof and the need for them to present evidence on all the issues they chose to dispute. Bankers Coal Co. v. Burnet,287 U.S. 308, 313 (1932); Arc Realty Company v. Commissioner,295 F.2d 98, 107 (CA8 1961), *116 affg. on this issue 34 T.C. 484 (1960); cf. Olson Motor Co. v. General Motors Corp.,703 F.2d 284, 289 (CA8 1983). I. Losses Relating to New Parsons
Petitioners contend that they are entitled to various loss deductions with respect to their dealings with New Parsons. Petitioners contend that the 4,000 shares of New Parsons preferred stock owned by Earl became worthless during 1965, and that they are entitled to a $111,300 deduction for worthless stock under section 165(g) for 1965. Petitioners also contend that they are entitled to nonbusiness bad debt deductions under section 166(d)(1) totaling $394,367, $182,000, and $108,256 for 1969, 1971, and 1974, respectively, because various advances made by petitioners to New Parsons became wholly worthless in those years. Respondent contends (1) that Earl's basis in the New Parsons stock did not exceed $11,300; (2) that the stock did not become worthless during any of the years in issue; (3) that Elva could have recovered a portion of the $394,367 paid to the bank in 1969 from William and Earl, Jr.; (4) that the advances for which the 1971 and 1974 bad debt deductions were claimed (a) did not give rise to bona fide debts, but were either *117 contributions to the capital of New Parsons, or gifts to William and Earl, Jr., or (b) were worthless when they were made; (5) that $17,000 of the claimed 1974 bad debt deduction was previously deducted in 1971; (6) that $3,324.45 of the 1974 deduction represented accrued interest, which petitioners had never reported in income; and (7) that none of the advances to New Parsons become wholly worthless during 1969 through 1974. Consequently, respondent concludes that petitioners are not entitled to, for any of the years in issue, a deduction for worthless stock under section 165(g) or any bad debt deductions under section 166(d)(1). We agree with respondent that petitioners have failed to prove that either the New Parsons stock or the alleged debts became wholly worthless during any of the years in issue. [21]
Subsections (f) and (g)(1) of section 165 [22] treat a loss from securities that become worthless during a taxable year as a loss from the sale or exchange *118 of a capital asset, subject to the limitations of section 1211 and 1212. Such a loss is deductible for the year in which the securities become wholly worthless. Scifo v. Commissioner,68 T.C. 714, 725-726 (1977); Aagaard v. Commissioner,56 T.C. 191, 209 (1971), and cases cited therein; sections 1.165-4(a) and 1.165-5(c), Income Tax Regs. This is a factual matter, as to which petitioners have the burden of proof, not only as to whether the securities became worthless at all, but also as to whether they became worthless in a year in issue. Boehm v. Commissioner,326 U.S. 287, 294 (1945); Scifo v. Commissioner,68 T.C. at 725. Section 166(d)(1)[23] *120 allows individuals to deduct worthless nonbusiness bad debts as short-term *119 capital losses. Such a debt is deductible in the year in which it becomes wholly worthless. Bodzy v. Commissioner,321 F.2d 331, 335 (CA5 1963), affg. in part and revg. in part a Memorandum Opinion of this Court; [24]Crown v. Commissioner,77 T.C. 582, 598 (1981). However, only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises under a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital is not considered a debt for purposes of section 166. Matter of Uneco, Inc.,532 F.2d 1204, 1207 (CA8 1976); section 1.166-1(c), Income Tax Regs. These are factual matters, as to which petitioners have the burden of proof, as to whether a bona fide debt exists, as to whether the debt became worthless at all, and also as to whether it became worthless in a year in issue. Caligiuri v. Commissioner,549 F.2d 1155, 1157 (CA8 1977), affg. a Memorandum Opinion of this Court; [25]Matter of Uneco, Inc.,532 F.2d at 1207; Crown v. Commissioner,77 T.C. at 598; Dallmeyer v. Commissioner,14 T.C. 1282, 1291 (1950). It is generally accepted that the year of worthlessness, of either stock or debts, is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hopes of recovery. Crown v. Commissioner,77 T.C. at 598; Scifo v. Commissioner,68 T.C. at 725; Dallmeyer v. Commissioner,14 T.C. at 1291-1292. See Boehm v. Commissioner,326 U.S. at 291-292. A. Worthlessness -- 1965-1968
We first consider whether the 4,000 shares of New Parsons preferred stock *121 owned by Earl became worthless in 1965, 1966, 1967, or 1968. As we stated in Morton v. Commissioner,38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (CA7 1940): From an examination of these cases it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current *122 liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. In the instant case, the record reveals no "identifiable events" during 1965 through 1968 that would support worthlessness of the New Parsons stock. The record does indicate that New Parsons' balance sheet reflects a negative shareholder equity (Capital Stock plus Retained Earnings) as of November 30, 1965, the date of Old Parsons' dissolution, and also as of February 28, 1966. (See table 12, supra.) Petitioners stress this *123 point. Also, Earl focussed on liquidation value in his testimony. [26] *124 However, it is clear that New Parsons was an ongoing business concern. Indeed, New Parsons reported millions in gross receipts for 3 consecutive years (1967, 1968, and 1969) after its stock allegedly became worthless, and almost $800,000 in gross receipts for the fourth year (1970). (See table 9, supra.) There is no evidence in the record that petitioners were contemplating liquidating New Parsons during 1965, or any other year in issue. Where a business continues to operate, we are most reluctant to accord controlling weight to balance sheet figures to determine worthlessness because such an approach ignores any possible going-concern value of the business. See Sika Chemical Corp. v. Commissioner,64 T.C. 856, 863 (1975), affd. without published opinion 538 F.2d 320 (CA3 1976). Also, New Parsons was able to turn profits on sales of its depreciable assets (see table 10, supra), further *125 refuting petitioners' contentions (see n. 26, supra) that New Parsons' balance sheets overstate the value of New Parsons' assets. [27] The record shows that New Parsons had substantial going-concern value during at least 1965 to 1968. As of February 28, 1966, New Parsons was engaged in at least six ongoing construction projects. (See table 8, supra.) Also, in October 1966, New Parsons entered into a substantial construction contract with Sunset. New Parsons *126 showed a profit for its taxable year 1967, and only a small loss for its taxable year 1968. (See table 9, supra.) Finally, New Parsons' books and records show positive shareholder equity as of February 28, 1967, and February 29, 1968. (See table 12, supra.) We conclude that Earl's New Parsons stock did not become worthless in 1965 [28], 1966, 1967, or 1968. B. Worthlessness -- 1969-1974
We next consider whether Earl's New Parsons stock or New Parsons' debts to petitioners became worthless in 1969, 1970, 1971, 1972, 1973, or 1974. The record does reveal certain "identifiable events" which bring into question the value of the New Parsons stock and New Parsons' debts to petitioners during 1969 through 1974 -- *127 the Sunset bankruptcy in 1969, the default by New Parsons on its debt to the Bank in 1969, the apparent default by New Parsons on a second debt to the Bank in 1971, a significant contraction in New Parsons' gross receipts, and the liquidation of a large portion of New Parsons' tangible assets. In addition, a comparison of New Parsons' net assets available to shareholders (table 13, supra) with New Parsons' outstanding debt to petitioners (table 7, supra) shows substantial shortfalls at the end of each of New Parsons' taxable years. However, the following transactions tend to negate any conclusion of worthlessness as to New Parsons' stock or New Parsons' debts to petitioners: Taxable Year 1971
May 1, 1970 -- New Parsons borrows $115,000 from the Bank, secured by Elva's stock. Nov. 4, 1970 -- Earl borrows $40,000 and transfers it to New Parsons. Jan. 21, 1971 -- Earl borrows $10,000 and transfers it to New Parsons. During the year -- Elva transfers $2,500 net to New Parsons. Taxable Year 1972
Mar. 21, 1971 -- Earl borrows $8,500 and transfers it to New Parsons. May 28, 1971 -- Earl borrows $8,500 and transfers it to New Parsons. During the year -- Petitioners transfer $32,478.52 net *128 to New Parsons. Taxable Year 1973
During the year -- Elva transfers $69,687 net to New Parsons. Taxable Year 1974
During the year -- Earl borrows $15,000 from the Bank and transfers it to New Parsons. During the year -- Elva transfers $31,955.68 net to New Parsons. Taxable Year 1975
During the year -- Elva transfers $20,128.07 net to New Parsons. We apply the judicially articulated guideline that "[w]here a creditor voluntarily advances further large sums to a debtor * * *, [the creditor] can hardly assert the worthlessness of the account on which the new advances were made." New York Water Service Corporation v. Commissioner,12 T.C. 780, 792 (1949). See, e.g., Record Wide Distributors, Inc. v. Commissioner,682 F.2d 204, 207 (CA8 1982), affg. a Memorandum Opinion of this Court, [29]Riss v. Commissioner,478 F.2d 1160, 1166-1167 (CA8 1973), affg. on this issue 56 T.C. 388, 410, 419 (1971), Dysard v. Commissioner,410 F.2d 455 (CA6 1969), affg. a Memorandum Opinion of this Court, [30] and Zarnow v. Commissioner,48 T.C. 213, 217 (1967), in which continued advances to a business were relied on by the Courts of Appeals and this Court in concluding that stock or debt of the business was *129 not worthless.
We conclude that neither Earl's New Parsons stock nor New Parsons' debts to petitioners became worthless in 1969, 1970, 1971, 1972, 1973, or 1974. [31]
C. Taxable Exchange -- 1965
On answering brief, petitioners contend that the 1965 liquidation of Old Parsons (as a result of which Earl relinquished his 163 shares of Old Parsons *130 Class A stock and received his 4,000 shares of New Parsons preferred stock) constitutes a taxable exchange. They contend that (1) Earl had a $111,300 basis in his Old Parsons stock, (2) he received in exchange for this New Parsons stock that was worthless, (3) petitioners thereupon realized a $111,300 long-term capital loss, and (4) they are entitled to deduct this loss for 1965. We pass the question as to whether this contention had been properly presented, so that respondent had a practical opportunity to present relevant evidence. See Markwardt v. Commissioner,64 T.C. 989, 997-998 (1975). Firstly, petitioners have failed to show us that Earl's basis in his Old Parsons stock significantly exceeded $11,300. On brief, petitioners state that the $111,300 they claim is comprised of Earl's "cost basis of common stock in Old Parsons ($11,300.00) plus a cash and equipment basis of Petitioners of $100,000.00 as set out in para. 10 of stipulations." The parties stipulated, and we have found, that Earl paid $100,000 for his New Parsons common stock on September 1, 1960. This $100,000 included equipment with a fair market value of $18,500. We have no information as to Earl's basis in *131 that equipment. However, the parties also stipulated, and we have also found, that Earl transferred his New Parsons common stock to William and Earl, Jr., on December 30, 1960. By endorsements dated that same day, William and Earl, Jr., transferred their Old Parsons Class A stock to Earl. (But see n. 3, supra, for indications that these transfers to Earl did not take place until the end of 1963.) We do not know if the transfers between Earl and his sons were gifts, exchanges, or separate transfers for separate considerations. There is no evidence as to the value or the basis of the Old Parsons stock that William and Earl, Jr., transferred to Earl. It is likely that Earl's basis in his Old Parsons stock exceeded $11,300, but we have no idea as to whether this increase in basis is trivial or approaches $100,000 as petitioners claim. Secondly, Earl's loss, if any, is the amount by which the basis of the Old Parsons Class A stock he gave up exceeded the value of the New Parsons preferred stock he received on the 1965 liquidation of Old Parsons. Sec. 1001(a). We have found that Earl's New Parsons preferred stock was not worthless in 1965. We have not set a value on Earl's New Parsons *132 preferred stock. Nothing in the record persuades us that its value was trivial. Nothing in the record persuades us that Earl's basis in Old Parsons Class A stock that he gave up in 1965 exceeded the value of the New Parsons preferred stock that he received on the liquidation of Old Parsons. Since petitioners have failed to prove there is a loss, there is no warrant in attempting to set the amount of any loss under the approach of Cohan v. Commissioner,39 F.2d 540 (CA2 1930). We conclude that, even if the taxable exchange theory is properly before the Court, petitioners have failed to prove that Earl sustained a loss on the exchange. We hold for respondent on this issue. II. Interest Expense Deduction
Petitioners contend that they are entitled to deduct the $13,102.53 interest payment made by Elva to the Bank in 1971. Respondent contends that no deduction is allowable because the interest was paid on the indebtedness of New Parsons, not the indebtedness of petitioners. We agree with petitioners. Section 163(a)[32] provides for a deduction for interest paid within the taxable year. Generally, for interest to be deductible under section 163, the interest must be on the indebtedness *133 of the taxpayer, not the indebtedness of another. Under this rule, no interest deduction is allowable for interest payments incurred by a guarantor on corporate obligations. Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 565 (1980), and cases there cited. The parties have stipulated, and we have found, that during 1970 New Parsons borrowed from the Bank the $115,000 on which this $13,102.53 interest payment was made by Elva during 1971. Nothing in the record suggests that either Earl or Elva was a cosigner of New Parsons' note to the Bank. Rather, it appears that the interest payment was made solely as a result of Elva's guarantee of New Parsons' debt to the Bank. Consequently, if we were to apply the general rule described above to the instant cases, as respondent urges us to do, we would have to conclude that petitioners are not entitled to deduct, under section 163, the $13,102.53 interest paid to the Bank in 1971. However, it has been recognized that a debt guarantee can result in a capital contribution or *134 gift. That is, the guarantor may be treated as having in substance borrowed from the lender and then having transferred the borrowed funds as a capital contribution or gift, as the case may be. See, e.g., Casco Bank & Trust Co. v. United States,544 F.2d 528, 534-535 (CA1 1976); Smyers v. Commissioner,57 T.C. 189, 198 (1971); Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 550 (1968); Ellisberg v. Commissioner,9 T.C. 463, 466-467 (1947). In the instant cases, respondent, in addressing the bad debt issue, determined in the notice of deficiency in docket No. 6213-76 that the $115,000 loan guarantee payment by Elva in 1971 was either a contribution to the capital of New Parsons, or an indirect gift to William and Earl, Jr. (resulting from the unrepaid transfers shown in table 14, supra). If we were to adopt respondent's contribution to capital theory, we would unscramble the transaction as discussed above and treat Elva as the actual borrower of the $115,000 from the Bank and allow the interest expense deduction. It seems clear that a similar unscrambling would be appropriate under respondent's alternate gift approach. See Ellisberg v. Commissioner,9 T.C. at 467. Petitioners *135 have failed to overcome respondent's determinations with regard to the loan guarantee arrangement, under issue I. We decline to allow respondent to have it both ways. We believe that, as the instant cases have developed, it is appropriate to treat the substance of the transaction as Elva having borrowed the $115,000 and then either having contributed it to New Parsons' capital or, in effect, having made a gift of it to William and Earl, Jr. In either event, consistent with respondent's determinations as to matters of fact in the notice of deficiency, the debt is to be treated as Elva's and petitioners are entitled to the claimed $13,102.53 interest expense deduction for 1971. We hold for petitioners on this issue. III. Bad Debts -- William and Earl, Jr.
Petitioners contend that they are entitled to nonbusiness bad debt deductions in 1974 of $19,711 (see n. 19, supra) and $8,700, relating to amounts transferred to William and Earl, Jr., respectively. Respondent contends that no deductions are allowable because the transfers did not result in bona fide debts and that, even if there were debts, they did not become worthless in 1974. We agree with respondent. A purported loan between *136 family members is always subject to close scrutiny. Caligiuri v. Commissioner,549 F.2d at 1157; Estate of Reynolds v. Commissioner,55 T.C. 172, 201 (1970). The presumption is that a transfer between family members is a gift. Estate of Reynolds v. Commissioner,55 T.C. at 201, and cases there cited. The record in the instant cases includes stipulations as to the amounts transferred to William and Earl, Jr., but does not include any evidence that the transfers were intended to be loans. There is no evidence that interest was required, or that repayments of the alleged loans were due on specified dates. There is no evidence that any payments were ever made on the alleged loans or that any efforts were made to collect the alleged loans. We conclude that petitioners have failed to prove that the transfers to William and Earl, Jr., resulted in bona fide debts. Also, the record does not include any evidence relating to the solvency of William or Earl, Jr., in 1974. The fact that petitioners transferred $7,911 to William during 1974, with the last payment coming on December 27, 1974 (see n. 18, supra), is clearly inconsistent with petitioners' claim of bona fide debts becoming worthless *137 in 1974, with respect to the transfers to William. We conclude that petitioners have failed to prove worthlessness in 1974, with respect to the transfers to either son. We hold for respondent on this issue. IV. Casualty Loss
Petitioners contend that they are entitled to deduct a $921 loss resulting from tornado damage to the roof of their residence in 1968. Respondent contends that the loss was fully compensated for by insurance, so that no deduction is allowable. We agree with respondent. Section 165(a) [33] provides for a deduction for a casualty loss (sec. 165(c)(3)), which is not compensated for by insurance or otherwise. Petitioners have the burden of proving entitlement to a casualty loss deduction. Welch v. Helvering,supra.Petitioners did not present any evidence on this issue and, therefore, have failed to carry their burden of proof. We hold for respondent on this issue. V. Sales Tax Deduction
Petitioners contend that they are entitled to deduct sales taxes of $646 for 1970. Respondent contends *138 that petitioners have not established that they made sales tax payments in 1970 in excess of $235.20, the amount allowed by respondent in the notice of deficiency. We agree with respondent. Section 164(a)(4) [34] provides for a deduction of State and local general sales taxes imposed on the taxpayer. Petitioners did not present any evidence on this issue, and, therefore, have failed to carry their burden of proof. Welch v. Helvering,supra. We hold for respondent on this issue. VI. Net Operating Loss Deduction
Petitioners contend that they are entitled to a net operating loss deduction of $8,936 in 1974, attributable to a carryover from 1971. Respondent contends that there was no net operating loss in 1971 as a result of the adjustments made to petitioners' 1971 income tax return in the notice of deficiency *139 in docket No. 6213-76 and that, even if a loss was sustained in 1971, petitioners failed to make the modifications required by sections 172(d)(2) (relating to capital gains and losses) and 172(d)(3) (relating to personal exemptions). We agree with respondent. In general, a taxpayer is allowed to deduct for a taxable year the aggregate of the net operating losses sustained in other years that may be carried over to the taxable year (sec. 172(a)). The taxpayer's net operating loss for a year is the excess of deductions allowed over gross income, with certain modifications (sec. 172(c)). As a result of our holding in Part I of the instant opinion, petitioners did not sustain a loss in 1971. Therefore, there can be no net operating loss carryover from 1971 to 1974. If a loss had been sustained, it is also clear that petitioners failed to make the modifications required by sections 172(d)(2) and 172(d)(3). [35]
We hold for respondent on this issue. To reflect the *140 foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The disallowances in the notices of deficiency of capital loss carryover deductions for 1966, 1967, 1970, 1971, 1972, 1973, and 1974, and the medical expense adjustments in the notices of deficiency for 1969, 1970, 1972, 1973, and 1974 are derivative and depend on the settled issues and our resolution of the issues in dispute. ↩
2. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
3. Notwithstanding the apparent December 30, 1960, transfers by Earl, Jr., and William, the minutes of the annual meetings of Old Parsons' shareholders dated January 8, 1962, and November 22, 1963, list Earl, Jr., and William as the owners of 25 shares each of Old Parsons stock.↩
4. New Parsons filed its tax returns for fiscal years ending on the last day of February. Unless indicated otherwise, all references to New Parsons' taxable years are to New Parsons' fiscal years ending on the last day of February.↩
5. The amounts shown as "Year-end Balance" on the stipulated exhibit -- $685,830.08 for taxable year 1972 and $739,625.76 for taxable year 1973 -- are evidently typographical errors.↩
6. The parties stipulated, in one paragraph, that this adjudication occurred on December 9, 1969; in another paragraph, they stipulated that this occurred on December 19, 1969. This conflict between the stipulations is not material in the instant cases. 7. The parties stipulated that the proof of claim was filed by Earl, as New Parsons' chairman of the board. However, the stipulated exhibit clearly recites that it is filed by William, as New Parsons' president. This conflict between the stipulation and the stipulated exhibit is not material in the instant cases.↩
8. So stipulated. The parties have not favored us with an explanation of how a contract could be uncompleted and, at the same time, be 100 percent completed.↩
9. This item is shown on New Parsons' 1970 tax return only on a typed schedule under the heading of "OTHER INCOME" as "Sale of Land & Improvements 61,463.67". There is no indication of adjusted basis, amount of depreciation previously taken, gross sale price, or any other information customarily found on a tax return with respect to such a sale. 10. This item is shown on New Parsons' 1971 tax return only on a typed schedule without a heading as "Depreciated Equipment 36,236.83". There is no indication of adjusted basis, amount of depreciation previously taken, gross sale price, or any other information customarily found on a tax return with respect to such a sale. ↩
11. New Parsons' 1972 tax return shows the following income item, without further explanation: Depreciation
17,843.73 (a)
(a) -- Excess depreciation taken previous years ↩
12. New Parsons' 1973 tax return shows the following income items, without further explanation: ↩
Sale of Equipment
31,000.00
Equipment Loss
10,000.00
13. This item is shown on New Parsons' 1974 tax return only on a typed schedule under the heading "MISC. INCOME" as "Sale of Equipment 939.92". Although the total is carried to line 9(b) of the Form 1120, which directs the taxpayer to "attach Form 4797", no Form 4797 is attached to the tax return and there is no indication of the information customarily found on a tax return with respect to such a sale.
14. New Parsons filed consolidated returns with Old Parsons for the taxable years ending February 28, 1965, and November 30, 1965. The amounts shown in table 12 relate only to New Parsons. ↩
15. These categories include the notes and accounts receivable from William and Earl, Jr., shown in table 14, infra.↩ The notes receivable are shown as "other investments" on the tax returns for taxable years 1970 and 1971, and are shown as "trade notes and accounts receivable" on the tax returns for the remaining years. 16. The parties do not attempt to reconcile the amounts shown on New Parsons' tax return balance sheets, with the amounts that parties have stipulated to reflect New Parsons' books, as shown in table 7, supra. The tax return balance sheet amounts are more for taxable year 1970 ($4,752.33), more for 1971 ($5,846.96), less for 1972 ($7,092.06), more for 1973 ($8,842.03), and more for 1974 ($8,842.03). Also, although substantially all of New Parsons' debts to petitioners are shown on New Parsons' books as being debts to Elva (table 7, supra↩) and the parties have stipulated that Elva never was a New Parsons shareholder, yet the balance sheets apparently treat the debts to Elva as loans from shareholders.
17. So stipulated. The sum of the listed check amounts is $19,211. Since we cannot tell from the record whether the $50 discrepancy results from an error in the parties' addition or an error in their copying of the amounts of the individual checks, our finding is in accord with the parties' stipulated total. ↩
18. Petitioners transferred the $7,911 to William in 32 checks of various amounts at irregular intervals, as follows: January (2 checks, $550), April (1, $400), May (3, $1,500), July (3, $1,350), August (6, $751), September (3, $350), October (4, $550), November (4, $850), and December (6, $1,610). The last of these checks is dated December 27, 1974.
19. See n. 17 and related text, supra.↩ Petitioners have not explained how they arrived at the $19,711 amount they claimed on their tax return.
20. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
21. At trial, the Court agreed to consider worthlessness of both the stock and the alleged debts during the other years before the Court if we found against petitioners with respect to the years for which the losses were claimed.↩
22. SEC. 165. LOSSES. * * * (f) Capital Losses. -- Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. (g) Worthless Securities. -- (1) General rule. -- If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.↩
23. SEC. 166. BAD DEBTS. * * * (d) Nonbusiness Debts. -- (1) General rule. -- In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. [The subsequent amendments of this provision (by paragraphs (1)(A) and (2) of sec. 1402(b) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1731, 1732, and by sec. 1001(b)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 1011) do not affect the instant cases.] ↩
24. T.C. Memo. 1962-40↩. 25. T.C. Memo. 1975-319↩.
26. THE COURT: You may proceed, Mr. Hawkins. THE WITNESS: Based on the exhibits before the Court and the stipulations, I contend the stock in Parsons Corporation, as of December 31, 1965, is worthless. Based on the signatures and stipulations, the potential value of the stock was not possible to predict. And I contend that, right along, it's been worthless. My continued work in the construction company -- in the construction industry, starting in 1919 through 1960, as an active administrator or owner in that industry, and all the various commissions and organizations in construction I've been on, and reviewing the construction industry and its operation as a whole, I am fully capable of determining the value of construction stock. During my time, I have found that, in the liquidation or the failure of a construction company, the only value is in their assets. Referring to the item in page 3, Exhibit 71, the last paragraph, I want to read into the record that the 1965 returns show that there is a minus stockholders' equity of from $39,497.35 to $85,019.44. And this is based upon a depreciable value of $197,495.30. In my opinion, these assets would bring, at a liquidation, more nearly $183,000.00. The asset value the land carried, at $59,341.90 is the actual cost paid for same. And there has been no indication that it would bring any increase in sale over cost, at the time that we disposed of that property.
27. On opening brief, respondent presented much the same material as appears in table 10, supra. On answering brief, petitioners state as follows: Petitioners dispute the authenticity of gains on the disposition of depreciable assetts [sic] as claimed by Counsel for Respondent on page 41 of his brief. * * * Counsel for Respondent does not show how he arrived at the claimed gains. There is nothing in the records or before the Court to substantiate these assumptions. The information in table 10 is taken from the stipulated-to tax returns of New Parsons. As can be seen from our findings (see table 4, supra,↩ and the text immediately before it), Earl's New Parsons preferred stock constituted 80 percent of New Parsons voting stock.
28. In disallowing petitioners' claimed 1965 long-term capital loss deduction, respondent failed to take into account petitioners' reported $108.82 long-term capital gain from a partnership. The correct adjustment would have resulted in a greater deficiency than the amount determined in the notice of deficiency. Respondent did not assert a greater deficiency at or before the hearing in these cases, so we do not have jurisdiction to redetermine a greater deficiency. Sec. 6214(a).↩
29. T.C. Memo. 1981-12↩. 30. T.C. Memo. 1968-21↩.
31. We note that, during the period for which petitioners contend that their New Parsons stock was worthless, and that their continued infusions into New Parsons (cash transfers and payments on loan guarantees) periodically became worthless debts, William and Earl, Jr., continued to increase their debts to New Parsons. These debts increased by about $400,000 between February 28, 1965, and February 28, 1975. (See table 14, supra.↩) Also, neither William nor Earl, Jr., paid any interest on these debts. This tends to support one of respondent's alternative contentions -- that petitioners' transfers to New Parsons were, in part, a device to benefit William and Earl, Jr., and did not give rise to bona fide debts. However, in view of our conclusion as to worthlessness, we need not rule on this contention.
32. SEC. 163. INTEREST. (a) General Rule. -- There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtednesss.↩
33. SEC. 165. LOSSES. (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.↩
34. SEC. 164. TAXES. (a) General Rule. -- Except as otherwise provided in this section, the following taxes shall be allowed as a deduction for the taxable year within which paid or accrued: * * * (4) State and local general sales taxes. [The repeal of paragraph (4) by sec. 134(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2116, does not affect the instant cases.]↩
35. Apparently, petitioners also failed to make the modifications required by section 172(d)(4) (relating to nonbusiness deductions); since respondent did not raise this issue, we do not take it into account in the instant cases.↩