MARTHA H. EGLY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Egly v. Commissioner
Docket No. 29753-85.
United States Tax Court
T.C. Memo 1988-223; 1988 Tax Ct. Memo LEXIS 251; 55 T.C.M. (CCH) 877; T.C.M. (RIA) 88223; May 18, 1988
*251 Stock owned by P became worthless during the year, but P kept few, if any, records with respect to capital contributions to corporations controlled by her. On the basis of testimony and checks in evidence, Held: P has established her entitlement to a loss on worthless stock. Held further: P's basis determined by making an approximation thereof. P also reported NOL and ITC carryforwards on her tax return, much of which were not usable because P's reported income was zero. The notice of deficiency disallowed a large deduction for worthless stock, but did not mention specifically that the NOLs and ITCs were disallowed. The amount of the deficiency, however, was computed without allowing any ITC or any of the deduction for the excess NOLs not used originally on the return. Held: P has the burden to prove her entitlement to the excess NOLs and ITCs, and she fails to meet that burden. Louis T. M. Conti and W. Lee Autman, Jr., for the petitioner. Eugene J. Wien, James C. Fee, Jr., and Lisa Primavera-Femia, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioner's 1977 Federal income tax in the amount of $ 1,133,913. *252 The issues for decision are (1) whether petitioner is entitled to a deduction for a loss on worthless stock and if so, in what amount, and (2) if not, or if the loss is in an amount less than $ 2,970,000, whether petitioner is entitled to carryforwards and carrybacks of investment tax credits and net operating losses. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Philadelphia, Pennsylvania when she filed her petition in this case. Shortly after his marriage to petitioner, petitioner's first husband, [1] *253 Otto Henze, founded Penn Fishing Tackle Manufacturing Company ("Penn Fishing") in the early 1930's. After the death of Otto Henze in 1949, the stock in Penn Fishing was owned 1/3 by petitioner and 2/3 by a trust for the benefit of the Henze children. Petitioner was named president of Penn Fishing in the early 1950's and remained in that office until 1963. At that time, her son, Herbert Henze, took over the presidency of Penn Fishing, and petitioner became chairperson of Penn Fishing's Board of Directors. Penn Fishing manufactures and distributes rods, reels, and other accessories used in sport fishing. Under the guidance of the Henze family, Penn Fishing has been and still is one of the leading companies in the sport fishing industry, concentrating mostly in salt water and big game tackle. As Herbert Henze noted, "When you see a man who catches a big shark, he probably used a Penn reel." Petitioner was chairperson of Penn Fishing until 1977, at which time she sold all her Penn Fishing stock to the corporation and resigned from any positions she had as an officer or director of Penn Fishing. [2] Petitioner realized $ 3,000,000 from the sale of her Penn Fishing stock. Her basis in the stock, which she had acquired upon her husband's death in 1949, was $ 30,000. She therefore reported a long term capital gain on her 1977 income tax return in the amount of $ 2,970,000. Respondent does not dispute the treatment of the sale of the Penn Fishing stock on petitioner's tax return. The terms upon which petitioner sold her Penn Fishing stock were *254 as follows: (1) petitioner's debts to Penn Fishing in the approximate amount of $ 742,000 were forgiven; (2) petitioner received a check in the amount of $ 258,000 from Penn Fishing; (3) Penn Fishing assumed petitioner's bank loan from Philadelphia National Bank in the amount of $ 1 million; and (4) Penn Fishing issued to petitioner a $ 1 million note which was payable to her in ten equal yearly installments. [3]
Michael Manchester became acquainted with petitioner and her children in 1960 when he was hired by Penn Fishing to perform private investigatory services. Shortly thereafter, petitioner and Mr. Manchester became constant companions and, after a few years, began living together. Petitioner and Mr. Manchester never married because of the fact that Mr. Manchester was married to someone else; he never obtained a divorce on account of religious restrictions. Mr. Manchester and petitioner were still living together in her house at the time of trial. In the course of his private detective and claims investigation business in Philadelphia, Mr. Manchester became aware of Rad-O-Lite, Inc. ("Erie"). Erie was incorporated in *255 1957, had its principal place of business in Erie, Pennsylvania, and engaged in designing, manufacturing, installing, and leasing traffic signals and burglar and fire protection systems. On November 9, 1960, Mr. Manchester paid Erie $ 25,000 for an exclusive franchise to distribute Erie's burglar and fire protection systems in the areas of Philadelphia and Atlantic City, New Jersey. By way of check dated November 6, 1960, petitioner had paid Mr. Manchester the $ 25,000 he needed to acquire the franchise. Petitioner's payment to Mr. Manchester was evidenced by an Agreement in which petitioner agreed to lend the $ 25,000 to Mr. Manchester in exchange for payment, in lieu of interest, of one half of the net profit after taxes which Mr. Manchester would derive from the franchise. The agreement provided that Mr. Manchester agreed to repay the $ 25,000 to petitioner within 30 months from the date of the agreement. No repayment of the loan ever was made by Mr. Manchester. Shortly thereafter, on January 24, 1961, two agreements were entered into by Mr. Manchester and Erie, and a third agreement was entered into by petitioner, Mr. Manchester, Erie, and certain of Erie's stockholders. The *256 effects of the agreements were as follows: Mr. Manchester's Erie franchise was expanded; petitioner and Mr. Manchester each received 2,500 shares of stock in exchange for Mr. Manchester's assignment to Erie of a burglar protection device invented by him -- the Rad-O-Phone; and petitioner, Mr. Manchester, and three other individuals (who were friends and relatives of petitioner) were issued an additional total of 50,800 Erie shares in exchange for payments by petitioner to Erie in the sum of $ 63,500. On July 19, 1961, petitioner and Mr. Manchester loaned Erie $ 200,000. The loan was secured by the assignment to petitioner and Mr. Manchester of Erie's accounts receivable and five of its patents. In addition, the loan agreement granted petitioner and Mr. Manchester the right "to form a corporation known as Rad-O-Lite, Inc. of Philadelphia." Petitioner individually provided the $ 200,000 that was loaned to Erie. Rad-O-Lite of Philadelphia, Inc. ("ROLP"), was incorporated on February 8, 1962, for the purpose of manufacturing, selling, leasing, and installing burglar alarm systems and traffic control systems. The initial incorporators were petitioner, Mr. Manchester, and Vincent P. Haley. *257 Petitioner was president of ROLP, and Mr. Manchester was vice president. Petitioner and Mr. Manchester each were issued 2,500 shares of ROLP stock. In exchange for the ROLP stock, Mr. Manchester transferred his Erie franchise to ROLP, and Mr. Manchester and petitioner transferred to ROLP their interests in the $ 200,000 Erie loan and the Erie assets securing the loan. Mr. Manchester and petitioner, however, did not transfer any of their Erie stock to ROLP. Erie continually had financial difficulties and a need for additional capital, so on March 13, 1962, petitioner, Mr. Manchester, and ROLP loaned Erie an additional $ 152,000, which was secured by Erie's accounts receivable and inventory and a pledge of 45,000 shares of Erie stock from three Erie shareholders. Later in 1962, ROLP and its shareholders demanded payment of that $ 152,000 loan. Instead of the loan being repaid, however, an agreement was reached under which petitioner, Mr. Manchester, and ROLP purchased an additional 100,000 shares of Erie stock (15,000 of which were already in their possession pursuant to the March 13 pledge) from a principle shareholder in Erie in exchange for $ 40,000. [4] *258 After several unprofitable years, Erie eventually filed forms with the Commonwealth of Pennsylvania to acknowledge that it went out of existence on June 30, 1965. In 1966 the assets of Erie were sold at a sheriff's sale. At about that time, ROLP [5] *259 acquired the patents securing the $ 200,000 loans; the patents, however, were transferred pursuant to the security interest arising out of the loan agreement, not through the sheriff's sale. Petitioner never received any cash repayments of her loans to Erie or on her investment in Erie stock. On petitioner's 1970 individual income tax return, she reported a $ 25,000 ordinary loss from property identified as "Rad-O-Lite, Inc. - Sec. 1244 Prop." The 1970 return reported that the property was acquired in 1962, was sold in December 1970, had a cost basis of $ 26,000, and was sold at a gross sales price of $ 1,000. Subsequent to the initial incorporation of ROLP, in which petitioner and Mr. Manchester each were issued 2,500 shares of stock, it is unclear how the ownership of the ROLP shares was divided between the two shareholders. As of July 1971, however, ROLP represented, in its election to be taxed under subchapter S of *260 the Code, [6] that its stock was owned as follows: petitioner -- 4,675 shares (93.5 percent); Mr. Manchester -- 325 shares (6.5 percent). The subchapter S election stated that Mr. Manchester had acquired his 325 ROLP shares in 1970. The stock ownership did not change until sometime in 1976 or 1977, when petitioner became the owner of 100 percent of the ROLP shares according to the ROLP corporate income tax return filed for the year ending June 30, 1977. ROLP's subchapter S election was first in effect for the fiscal year beginning July 1, 1971. ROLP filed tax returns as a subchapter S corporation for three years. ROLP filed income tax returns as a corporation taxed under subchapter C for the fiscal years ending June 30, 1975, June 30, 1976 and June 30, 1977. ROLP also had filed returns as a corporation taxed under subchapter C for the early years of its existence in the 1960's. As is shown by its corporate income tax returns, ROLP was never a profitable corporation. *261 ROLP's tax returns reported gross receipts and net losses as follows: Year Ending
Gross Receipts
Reported Net Loss
12/31/62
$ 13,905.88 $ 52,309.02 12/31/63
Not Available
39,527.11
12/31/64
23,043.29
128.12
12/31/65
46,552.09
212.13
12/31/66
2,517.50
1,697.58
[7] 6/30/72 6,779.00
98,272.00
6/30/73
-0-   63,410.00
6/30/74
200,424.00
189,713.00
6/30/75
359,067.00
14,445.00
6/30/76
205,786.00
88,219.00
6/30/77
43,704.00
125,860.00 During the three years that ROLP was a subchapter S corporation, ROLP's corporate returns and petitioner's individual returns reported petitioner's share (93.5 percent) of ROLP's flow through losses of $ 91,884, $ 59,288, and $ 177,382. [8] *262 ROLP was in constant need of additional cash infusions, most of which came from petitioner. Petitioner alone was not able to provide all the financing needed by ROLP. Additional infusions of capital into ROLP were provided either in the form of direct payments from Penn Fishing, which petitioner authorized, or in the form of loans from banks and other lenders made to petitioner or made to ROLP directly and guaranteed by petitioner. Philadelphia National Bank ("PNB") was the primary lender during the 1970's. As security for the PNB loan, petitioner was required to pledge her stock in Penn Fishing as collateral, that stock being her only significant asset. From time to time, petitioner also pledged her home as security for smaller loans. ROLP's tax returns reported outstanding *263 loans payable to shareholders as follows: Date
Loans Outstanding
12/31/62
$ 170,033.23
12/31/63
283,592.70  12/31/64
290,048.32  12/31/65
290,348.54  12/31/66
306,627.11  [9] 6/30/75 575,602.00  6/30/76
444,202.00  6/30/77
643,904.00  On July 9, 1963, Alert Alarm Corporation ("Alert") was incorporated for the purpose of dealing in burglar alarm systems. The record does not indicate the identity of the initial incorporator(s) of Alert; however, petitioner's son Walter Henze ("Walter") acquired 100 percent of the outstanding stock of Alert (500 shares) on January 15, 1964. In 1968 Walter transferred the Alert shares to ROLP. In exchange for the transfer of the Alert stock, Mr. Manchester paid Walter $ 10,000 and Mr. Manchester and ROLP acknowledged that they were indebted to Walter in the principal amount of $ 125,000 on account of money lent by Walter and used for the benefit of ROLP or *264 Alert. Alert's corporate tax returns for the years 1971 through 1980 reflect the ownership of the Alert stock as follows: 1967-12/75
12/75-12/28/80
After 12/28/80
Petitioner
500 shares
300 shares
--
Mr. Manchester
--   200
[10] 500 shares The business carried on by Alert after its incorporation was, in effect, the alarm business formerly carried on by ROLP. Alert was formed to allow ROLP to concentrate on its traffic control business. After petitioner gained control of Alert, Alert's offices were at the same location as those of ROLP, and employees of either corporation from time to time performed services *265 for the other corporation. Expenses of each company were paid out of the bank accounts of both companies, as well as with personal checks from petitioner and Mr. Manchester. The personal checks were payable directly to the vendor or payable to Mr. Manchester or to "Cash," in which case Mr. Manchester or another employee cashed the check at the bank and took the cash directly to the vendor. It did not matter to petitioner which entity paid the bills as long as the bills were paid. The funds of Mr. Manchester, petitioner, ROLP, and Alert were commingled freely. To aid the accountants who prepared the tax returns, however, Mr. Manchester went through the checkbooks and the paid bills and identified the corporation to which each payment was attributable. On the balance sheets filed with its income tax returns, Alert reported loans from shareholders in the following amounts: Date
Shareholder Loans Payable
12/31/75
$ 618,124  12/31/76
728,615    12/31/77
843,222    12/31/78
1,179,972  12/31/79
1,251,911  Mr. Manchester was the operating officer for ROLP from its inception; he also became the operating officer for Alert in 1967 or 1968, and remained so throughout the relevant years. The corporations, *266 especially ROLP, consumed all of his time and energy. He lived an extremely modest lifestyle. His only indulgence was cigars; he smoked Webster Fancy Tail cigars. There was nothing extravagent in his clothing, except for a felt hat that he "sported" at one time. Other than that, he "lived a life of near penury." The automobiles he drove were all "cast offs or broken down cars." Mr. Manchester's income during the ROLP years totalled approximately $ 12,000 to $ 13,000 per year. Except for what little money he used for his frugal living expenses, Mr. Manchester put virtually all of his funds into the operations of ROLP. In fact, before he moved in with petitioner, he had been living in a backroom in the ROLP warehouse which was described as a "pig sty." On February 21, 1979, Mr. Manchester was convicted under Federal law of participation in the activities of a racketeering enterprise, conspiracy to participate in a racketeering enterprise, mail fraud, and subscription to a false corporate income tax return of ROLP for the fiscal year ended June 30, 1975. ROLP also was convicted of conspiracy to engage in racketeering. [11] The convictions were a result of a Federal grand jury criminal *267 investigation into bid rigging in the traffic control field and payments of bribes to Pennsylvania Department of Transportation officials. Mr. Manchester's conviction was based upon payments made through ROLP (with his knowledge) to officials in the pursuit of traffic system business for ROLP. [12] The grand jury investigation into ROLP had begun in late 1976 *268 or early 1977. The fact that ROLP was being investigated was well publicized; there were major newspaper articles discussing the matter. ROLP's customers and vendors were aware of the grand jury investigation. The attendant publicly interfered with ROLP's sales to customers. A mail watch of ROLP began, and agents of the U.S. Attorney's Office made direct inquiries of customers and business acquaintainces of ROLP, petitioner, and Mr. Manchester. ROLP's sales decreased, and the business was even more strapped for cash than in prior years. ROLP's vendors and suppliers would not deliver goods to ROLP without being paid in cash upon delivery. As ROLP's sales declined and its financial position deteriorated, PNB began pressing petitioner and Penn Fishing for repayment of the loans outstanding to it. Finally, late in 1977, petitioner and Mr. Manchester decided that ROLP should discontinue operations. As noted above, Penn Fishing relieved petitioner of her debt obligations to both PNB and Penn Fishing, transferred cash to her, and executed a promissory note payable to her in exchange for her transfer to Penn Fishing of all her Penn Fishing stock. Much of the cash petitioner received *269 from the sale of her Penn Fishing stock was used to pay off creditors of ROLP. [13]
Petitioner and Mr. Manchester attempted to dissolve ROLP in December 1977 with the help of the accountant then representing petitioner and ROLP, Robert Kohn. Mr. Kohn prepared two reports for the Commonwealth of Pennsylvania. One was an Out of Existence Affidavit for ROLP which asserted that ROLP ceased to transact business on or about December 31, 1977. On March 18, 1978, Mr. Kohn also prepared a Distribution of Assets in Dissolution (the "Distribution report") which asserted that ROLP was dissolved on December 31, 1977, and that its assets were distributed to petitioner on that date. The Commonwealth of Pennsylvania received notice of ROLP's cessation of business, as evidenced by the following letter from the state's Department of Revenue Bureau of Accounts Settlement: We acknowledge receipt of a statement stating [ROLP] ceased doing business as of December 31, 1977. This Bureau has no record of receiving tax reports for the years [sic] ending December 31, 1964, December 31, 1965, and December 31, *270 1966. In order to effect final settlement on this account and to remove the estimated settlements, please forward tax reports for the respective years to the attention of the undersigned.
Apparently, petitioner and Mr. Kohn never bothered to file the outstanding state tax reports because, as of the date of trial, the Secretary of the Commonwealth of Pennsylvania certified that ROLP remained "a presently subsisting corporation" insofar as the state was concerned. On March 14, 1978, ROLP filed an application for and received an extension of the date for which to file its short period final Federal income tax return for the period from July 1, 1977, through December 31, 1977. On June 15, 1978, ROLP filed an application for and received from respondent an additional extension of time to file its final return. The second application contained a statement that the "U.S. District Attorney's Office and Grand Jury" had ROLP's books and records and, therefore, the corporation did not have sufficient data to file a final return. No final Federal income tax return ever was filed for ROLP. The latest ROLP balance sheet in the record is the one prepared for the last Federal income tax return filed *271 by ROLP. The balance sheet was prepared by Mr. Kohn and showed that ROLP's financial position as of June 30, 1977, was as follows: Accounts Receivable
$ 2,226  Inventory (Estimated)
364,089
Prepaid Interest
675
Buildings and Equipment (net of
accumulated depreciation)  14,880
Total Assets
$ 381,870
Accounts Payable
$ 35,500   Short Term Mortgages & Notes Payable
45,540 Loans from Shareholders (Estimated)
643,904 Loans Payable
260,885 Capital Stock
1,000 Retained Earnings (Estimated)
(604,959)
Total Liabilities and Equity
$ 381,870  Although the documents prepared by Mr. Kohn assert that ROLP's assets were distributed upon dissolution to petitioner on December 31, 1977, petitioner never took possession of any of the assets. [14] The Distribution report listed petitioner as receiving inventory in an "amount" of $ 350,000 and three trucks and a station wagon whose "amounts" totalled $ 10,000. Mr. Kohn had prepared that report based on the approximate book value of the assets. The value of the final inventory was provided to Mr. Kohn by ROLP's chief engineer, whose based the valuation only on his estimate of the costs that had been incurred to manufacture the traffic equipment. [15] A significant portion *272 of the costs included in that inventory were salary and wage expenses for engineering, maintenance, and installation personnel, i.e., expenses for tooling the equipment to specifications of ROLP and its customers. ROLP's tax returns treated such salaries and wages as a cost of inventoriable goods rather than as a current deduction. In fact, the last two ROLP Federal tax returns reported such inventoried salary expenses in the total amount of $ 183,556 and costs of goods sold in the total amount of $ 292,538 for the two years. Those returns also reported inventories as of June 1976 and June 1977 in the respective amounts of $ 315,800 and $ 364,089, amounts which approximate the $ 350,000 reported on the Distribution report as the December 1977 inventory. The $ 350,000 value given for ROLP's final inventory, however, far exceeded the fair market value of the inventory. After ROLP ceased operations, the bulk of the inventory assets remained where they were, in the warehouse used *273 by ROLP, until at least 1981 or 1982. The ROLP inventory remained unused because of changes in the middle of the 1970's in the equipment used in the traffic signal industry. [16] Those changes caused the Rad-O-Lite, a patented device which was ROLP's primary stock-in-trade, to become obsolete. As of the early 1970's, the technology in the industry was such that emergency vehicles used devices which utilized radio signals to switch and control stoplights at intersections. The Rad-O-Lite was such a device. Approval from the Federal Communication Commission ("FCC") was required before the radio-activated equipment could be installed at any intersection. An additional disadvantage of the radio-activated devices was their use of a multi-directional radio signal. By their very nature, such signals sometimes interfere with traffic patterns on parallel streets by triggering traffic lights on those streets. By the middle 1970's, however, a high intensity optical emitter was developed in the industry whereby the control device in the emergency vehicles would saturate the intersection with light, which in turn would activate the circuitry that switched the stoplights. The light-activated equipment *274 did not require FCC approval and did not affect the stoplights on other streets. The patented Rad-O-Lite was a "one green, three red" device, i.e., a system whereby an emergency vehicle could trigger stoplights at an intersection so that the direction in which the emergency vehicle was heading would have a green light and all other directions at the intersection would have red lights. Such a system was described as a "preemptor." When a stoplight receives the signal from a preemptor, the preemptor overrides the signal's switch control system and the stoplight for the oncoming emergency vehicle immediately becomes green, regardless of the present phase of the signals at the intersection. Traffic heading in directions *275 other than that of the emergency vehicle suddenly will see a red light, rather than seeing the stoplight progress through the normal yellow-red sequence. A preemption system also requires physical modification of the internal controller of the stoplight. During the middle 1970's preemptors came to be far less in demand because of the development and marketing of a priority control system described as a "phase selector." A phase selector is unlike a preemptor in that an emergency vehicle using a preemptor has total control of the lights at the intersection, whereas a vehicle using a phase selector only has the ability to accelerate the light switching sequence. A phase selector works much like a "Walk" button which a pedestrian pushes to cross a street; it simply accelerates the normal switching sequence. Unlike a preemptor system, a phase selector system is external, leaving the internal mechanism of the stoplights untouched. The use of a phase selector promotes safety much better than does the use of a preemptor. The preemptor's sudden change of the light for the streets intersecting the path of the emergency vehicle might tend to surprise or confuse drivers travelling on those *276 streets, thus increasing the chance of a collision. With the use of a phase selector, however, such surprise and confusion is much less likely because the stoplight progresses through a normal cycle before the emergency vehicle arrives at the intersection. A patent for a phase selector system using a high intensity optical emitter was issued to the Minnesota Mining and Manufacturing Company ("3M") on August 6, 1974. By 1975 3M had begun to market such a phase selector; however, the phase selector was not yet usable in all locations because it did not comport with provisions in some states, e.g., New York, which required that an intersection under priority control show one green light and three red lights. As noted above, the phase selector is a device which does not affect the internal workings of the stoplight controller, so it did not have the ability to put the stoplight into an abnormal sequence and thus could not provide a one green-three red sequence if the stoplight was not already so sequenced. As traffic officials came to appreciate the safety advantages of phase selection, however, traffic control provisions changed to accommodate the new phase selection technology. *277 The availability of phase selection (at least from 3M) in conjunction with its comportment with traffic control provisions caused preemptor equipment including the preemptor equipment that ROLP had in inventory, to become generally obsolete. ROLP first considered the feasibility of designing and marketing a phase selector as early as 1975. As of June 1976, ROLP had prepared a five page advertising document which gave a brief description of the features and specifications of a model ROLP phase selector. The advertising document also included drawings of the front and back of the ROLP phase selector, as well as a simple schematic of the phase selector. When the advertising document was prepared in 1976, however, ROLP had not yet developed a marketable phase selector. The extend of ROLP's expertise in phase selection was that ROLP's two engineers, when they were not otherwise engaged in work for Alert or on repair and maintenance of preemptors, experimented from time to time with the development of a phase selector in 1976 and 1977. Shortly after the decision was made to discontinue ROLP's operations, Pre-Emption Devices, Inc. ("PDI") was incorporated on January 30, 1978. PDI began *278 operations on or about April 1, 1978, and the initial shareholders were petitioner (80 shares) and Mr. Manchester (20 shares). [17] PDI's principal line of business was the development, manufacture, and sale of phase selectors. [18] *279 PDI operated from the same office and plant space as had ROLP. To the extent that PDI had need of any of the former inventory of ROLP, which remained stored in the building now used by PDI, the PDI employees would use the former ROLP inventory. The trucks which were "distributed" to petitioner by ROLP were not used by PDI. [19] Most, if not all, of the former employees of ROLP became employees of PDI. After 1977, PDI continued to use a distinctive triangular logo that ROLP had used on its equipment and stationery, and PDI's phone number was listed beside the heading "Rad-O-Lite by Pre Emption Devices, Inc." Alert also continued to advertise in the telephone directory yellow pages using the ROLP name and logo. PDI's first Federal income tax return was filed for the period ending on December 31, 1978. On its 1978 tax return, PDI reported no assets or liabilities at the beginning of the year because the 1978 return was PDI's "initial return." PDI's first three tax returns reported inventory and loans from shareholders in the following amounts: Date
Inventory
Loans Payable to Shareholders
12/31/78
$ 15,532
$ 50,000 12/31/79
55,447  341,331  12/31/80
65,640  433,543   PDI reported gross receipts, costs of sales, and taxable income or loss on its first three tax returns as follows: Year End
Gross Receipts
Cost of Sales
Taxable Income (Loss)
12/31/78
$ 119,018
$ 68,755
$ 9,625    12/31/79
97,455   48,728  (185,293)  12/31/80
116,195  61,198  (83,607)   OPINION *280 The primary issue in this case is whether petitioner is entitled to a long-term capital loss for 1977 on account of her investment in ROLP. In support of her case, petitioner first asserts that her stock in ROLP became worthless during 1977. Respondent counters that the stock still had value by the end of 1977 or, in the alternative, that the stock became worthless in a year before 1977. Petitioner next asserts that even if the ROLP stock did not become worthless in 1977, there was a complete liquidation of ROLP during 1977, so she is entitled to a resulting loss under section 331. Respondent retorts that no liquidation and final distribution of ROLP's assets occurred in 1977. Respondent also argues that even if there were any liquidation and distribution of assets in 1977, it should not be accorded independent significance because the transaction merely was an integral step in a plan of reorganizing ROLP as PDI; as such, any loss may not be recognized on account of the provisions of sections 368 and 354. Respondent also makes the general argument that even if petitioner may recognize a capital loss, she has not shown that her basis in ROLP, if not zero, was greater than any *281 amount she realized from distributions of ROLP's assets. Respondent asserts that any of his grounds is sufficient to support a decision in his favor. Petitioner offers an additional issue for consideration if we should find either that she is not entitled to recognize a loss or that her loss from ROLP was less than $ 2,970,000, the amount of her 1977 capital gain from Penn Fishing. Specifically, petitioner alleges that she is entitled to carrybacks and carryforwards of NOLs and ITCs that would reduce her 1977 taxable income. Respondent also disputes this final assertion and contends that petitioner is entitled to no NOL deduction or ITC because she has not proved her entitlement to any such carryforwards or carrybacks for 1977. Petitioner has the burden to prove that respondent's determinations in the notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). We agree with petitioner that the ROLP stock became worthless in 1977; however, we do not agree that petitioner has shown that she is entitled to a deduction large enough to offset in full her capital gain from the Penn Fishing stock. [20] *282 The parties do not dispute the applicable law with respect to the deductibility of a loss for worthless stock. Section 165(g)(1) provides that if a security which is a capital asset becomes worthless during the taxable year, the resulting loss is treated as the sale or exchange of a capital asset. Respondent readily concedes that petitioner's ROLP stock is a security for purposes of section 165(g) and that the stock was a capital asset. [21] *283 What respondent contests, however, is whether the ROLP stock became worthless. A loss from a worthless security is deductible for the year in which the security becomes wholly worthless. Sec. 1.165-5(c), Income Tax Regs.; Scifo v. Commissioner,68 T.C. 714, 725-726 (1977); Aagaard v. Commissioner,56 T.C. 191, 209 (1971). A mere shrinkage in the value of the stock owned by the taxpayer, even though extensive, does not give rise to a deduction if the stock has any recognizable value on the date claimed as the date of the loss. Sec. 1.165-4(a), Income Tax Regs.; Scifo v. Commissioner,68 T.C. at 725. This is a factual matter as to which petitioner has the burden of proof, not only as to whether the securities became worthless at all, but also as to whether they became worthless during the year in issue. Boehm v. Commissioner,326 U.S. 287, 294 (1945); Scifo v. Commissioner, supra.[22] Our duty is to draw whatever inferences and conclusions are reasonable from the facts before us. Boehm v. Commissioner, supra.
Petitioner has the burden of proof that the ROLP stock ceased to have both liquidating value (an excess of assets over liabilities) *284 and potential value (a reasonable expectation that the assets would exceed liabilities in the future) in 1977. Steadman v. Commissioner,50 T.C. 369, 376 (1968), affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970). Generally this burden of proving potential value is met by showing an identifiable event in the corporate life. Steadman v. Commissioner,50 T.C. at 376-377. As we stated in Morton v. Commissioner,38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940): it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings *285 or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe the, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on it current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, it its exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. The first issue is whether ROLP had liquidating value at the end of 1977. We first look at the last balance sheet available for *286 ROLP -- the June 30, 1977, balance sheet in the 1977 tax return. At that date, ROLP's assets were reported to have a book value of $ 381,870, of which $ 364,089 represented an estimated amount of inventory. ROLP's liabilities were reported to be $ 985,829, an amount far in excess of the value given for the assets. The loans from shareholders, however, are more properly considered as equity in ROLP. See footnote 21, supra.Excluding the loans from shareholders, ROLP's liabilities were $ 341,925, or approximately $ 40,000 less than the book value of total assets. If the inventory value were reduced by 11 percent, ROLP would have lacked any net worth on its balance sheet. See Ansley v. Commissioner,217 F.2d 252, 256 (3d Cir. 1954). We have seen no indication that any phase selection equipment was included in ROLP's inventory. Indeed, the record as a whole indicates to us that ROLP did not sell any phase selectors and never entered into any agreements to sell or install phase selectors. As of 1977, any parts or equipment owned by ROLP that were usable in phase selectors therefore would not have had significant value. ROLP's preemptor equipment had become obsolete by 1977 and clearly *287 was worth much less than the amount listed as the inventory value on the balance sheet. We thus find that the actual value of the inventory was significantly less than the book value at which it was reported on the balance sheet; certainly, the inventory's fair market value was less than 89 percent of its listed cost. See Ansley v. Commissioner,217 F.2d at 256-257 (even though no appraisal was in evidence, the Court held that a corporation's inventory had decreased significantly in value, based solely upon the testimony of witnesses familiar with the market value of the inventory). In addition, as ROLP continued to make few, if any, sales and lose money during the second half of 1977 (after the date of the balance sheet), the negative worth of the corporation only would have grown greater. In short, we therefore find that ROLP had no liquidating value as of December 1977. A similar analysis of ROLP for 1976 might show that ROLP also may not have had liquidating value in 1976. Although it is a necessary element, a loss of liquidating value alone does not show that a stock has become worthless. [23] Petitioner also must show that an identifiable event has occurred to terminate any *288 hope or expectation of potential value of the stock. Austin Co. v. Commissioner,71 T.C. 955, 970 (1979); Morton v. Commissioner,38 B.T.A. at 1278. The continuation of ROLP's operations from 1976 into 1977 is a strong indication that, in spite of the history of operating losses, the stock was not worthless at the end of 1976. Bullard v. United States,146 F.2d 386, 388 (2d Cir. 1944); Hull's Estate v. Commissioner,124 F.2d 503, 504 (2d Cir. 1942), affg. a Memorandum Opinion of this Court. There is no evidence that would point to any year before 1977 as a year in which ROLP's future prospects became any more dismal than in 1977. [24] We therefore find that ROLP still possessed potential value as of the end of 1976. There are, however, several events occurring in 1977 which would indicate that the ROLP stock became worthless in 1977. First, the testimony of Herbert Henze and the other witnesses indicates that Penn Fishing finally had become impatient with petitioner's constant borrowings and advances of funds to ROLP. It is evident that Penn Fishing (through petitioner's children *289 who owned the majority of the stock) in effect called the advances owed to it by petitioner and ROLP when ROLP's business did not improve during 1977. Except for petitioner's Penn Fishing stock, neither petitioner nor ROLP possessed assets worth anywhere close to the $ 742,000 owed to Penn Fishing. Petitioner thus was forced to sell her Penn Fishing stock in order to repay the advances made by Penn Fishing. That petitioner was forced to sell her Penn Fishing stock alone might be sufficient evidence to an identifiable event showing ROLP's worthlessness; however, there are other identifiable events. Petitioner and Mr. Manchester ceased to do business under the ROLP name as of the end of 1977. They intended to dissolve the corporation, as evidenced by the two reports prepared by Mr. Kohn for the Commonwealth of Pennsylvania and by the filing of the applications for extensions of time to file a final Federal income tax return. That ROLP never was dissolved officially by the Commonwealth of Pennsylvania is a mere technicality not affecting the worthlessness of the stock. The grand jury investigation is another identifiable event which adversely affected the value of the ROLP stock. *290 In fact, that investigation may have been the catalyst causing the stock finally to lose what potential value remained. As the grand jury questioned the customers and other business acquaintainces of Mr. Manchester and ROLP, the desire of customers, both potential customers as well as any with whom ROLP maintained ongoing activity, to enter into business dealings with ROLP surely was chilled. The rise of the phase selector technology as the standard equipment in the industry, however, most likely tolled the final death knell for any potential value remaining in ROLP's preemptor business. By the end of 1977, phase selection had become the preferred method of effecting priority control of stoplights. ROLP's total receipts for the twelve months ending June 30, 1977, had declined to only $ 43,704. Mr. Manchester and the other ROLP employees realized that the industry had changed and that phase selection had become the wave of the present, not just the future. In short, we find that ROLP's preemptor business had declined in value to such an extent that any potential value remaining in it surely was exceeded by ROLP's liabilities. We appreciate that ROLP employees may have begun tinkering *291 with phase selector equipment before the end of 1977. However, we have seen no indication that ROLP ever developed a phase selector to a level whereby it could make available a functional phase selector to customers. Any efforts that had been put into phase selection by ROLP thus were of only nominal value as of the end of 1977. Respondent suggests that the continuation of petitioner and Mr. Manchester in the traffic control business, in the form of PDI, indicates that ROLP, as a traffic control business, at least had potential value at the end of 1977. Yet, the fact that a new corporation (PDI) developed a marketable phase selector does not show that ROLP had any value. [25] *292 Indeed, such a fact indicates that petitioner and Mr. Manchester finally had "thrown in the towel" on the preemption business and had decided that if they were to attempt to develop a phase selector, they would do so in another corporation, not in ROLP. The events we have noted are all identifiable events occurring in 1977 which would form the basis of reasonable grounds for abandoning hope of recovery in that year. Scifo v. Commissioner,68 T.C. at 726-727. Therefore, based on our consideration of all the surrounding facts and circumstances, we find that ROLP's stock became worthless in 1977. Having decided that petitioner is entitled to a deduction for 1977 for the worthlessness of the ROLP stock, we now must determine the amount of the deduction to which she is entitled. She still bears the burden of proof. Rule 142(a). There is no question that petitioner advanced large sums of money over the years to finance the operations of ROLP, as well as the operations of the other companies with which she and Mr. Manchester were associated. What is not so clear is the quantum of funds advanced to any one of the corporations, or the delineation between the operations of any one of the corporations and the operations of the other corporations. Petitioner, however, has only herself to blame of uncertainties *293 because of the totally inadequate recordkeeping for the corporations she controlled and the substantial commingling of funds among those corporations and petitioner. See sec. 6001. The fact that it may be difficult for petitioner to establish her basis in her ROLP stock does not relieve her of her burden to do so. Burnet v. Houston,283 U.S. 223, 228 (1931); Coloman v. Commissioner,540 F.2d 427, 430 (9th Cir. 1976), affg. T.C. Memo. 1974-78. Petitioner and respondent have stipulated into evidence dozens of checks written by petitioner, as well as payments made by Penn Fishing to ROLP or Mr. Manchester. The various payments total over $ 3 million, and petitioner requests that we find that her basis in the ROLP is at least $ 2.97 million. Respondent contends, however, that petitioner's basis cannot be determined with any precision due to the lack of books and records and the pervasive commingling of funds. Petitioner in turn requests that we be sympathetic to the difficulty in producing original records for the years 1960-1977, especially in consideration of the fact that the trial herein did not take place until 1987. In light of petitioner's duty under section 6001 to keep *294 adequate records, however, we find little reason to be sympathetic to petitioner's neglect of her duty. Rather, we agree with respondent's statement that petitioner is caught in a web of her own making. The Court is now asked to find its way through the labyrinth of petitioner's bewildering financial affairs and estimate what petitioner contributed to ROLP directly or expended on its behalf, what amounts were actually expended in the business operation of ROLP, and what amount passed through ROLP for the benefit of Alert or Manchester. Nevertheless, we are convinced that petitioner is entitled to some deduction for the ROLP stock, so, even though petitioner cannot adequately establish the full amount of the basis she claimed, it is improper for us to deny the deduction in its entirety. Edelson v. Commissioner,829 F.2d 828, 831 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930). We certainly have enough evidence before us to establish that petitioner's basis was other than zero. Cf. Coloman v. Commissioner,540 F.2d at 427. The record contains sufficient facts for us to make an approximation of petitioner's basis. *295 See Williams v. United States,245 F.2d 559, 560 (5th Cir. 1957). [26] The necessity for making an approximation is a result of petitioner's chronic failure to maintain records. Any uncertainty as to amounts includable in petitioner's basis therefore will be weighed against petitioner because the inexactitude is of her own making. Browne v. Commissioner,73 T.C. 723, 729 (1980). See also Cohan v. Commissioner, 540 F.2d at 544. [26]
The first amounts to be included in petitioner's basis are her basis in property transferred to ROLP as its initial incorporation. ROLP was incorporated with Mr. Manchester's Erie franchise and the $ 200,000 Erie loan. Even though the franchise was in Mr. Manchester name, petitioner paid the $ 25,000 used by him to acquire the franchise, and she never attempted to enforce repayment of the amount. We hold that petitioner contributed as capital her right to repayment of that amount when ROLP was incorporated and that she therefore is entitled to a basis in ROLP for that amount. Petitioner also provided the $ 200,000 that was loaned to Erie, and we find that amount is includable in her ROLP basis. Petitioner *296 therefore is entitled to a basis in ROLP of $ 2255,000. [27]
Petitioner's 1970 individual income tax return reported a sale of stock acquired in 1962 of "Rad-O-Lite, Inc." It appears to us that the reported stock sale was of ROLP shares. ROLP's subchapter S election represented the Mr. Manchester acquired his ROLP shares in the same year that petitioner's stock sale was reported, 1970. Petitioner first acquired stock in Erie in 1961, not in 1962, yet she acquired her ROLP stock in 1962. Finally, we wonder how petitioner could have sold Erie stock in 1970 when the company went out of existence in 1965 and had all of its assets sold at a 1966 *297 sheriff's sale. In short, we believe that the loss reported on petitioner's 1970 tax return was for the transfer of ROLP shares from her to Mr. Manchester. Since petitioner's 1970 return reported that she sold shares had a basis of $ 26,000 we find that her basis in ROLP stock must be decreased by that amount. For the 1972 and 1973 years petitioner reported flow through subchapter S losses from ROLP in the total amount of $ 151,172. We find that she must decrease her ROLP basis by that amount. [28] According to petitioner, the largest *298 portion of her ROLP basis was attributable to the many payments made by her (either directly or through Penn Fishing) to or on behalf of ROLP. Petitioner points to checks totalling more than $ 3 million and alleges all represented payments for ROLP. It appears, however, that some of those payments were on behalf of Alert. That assessment is supported generally by the testimony at trial and specifically by Alert's 1977 corporate income tax return, which reported loans from shareholders in amounts of $ 728,615 and $ 843,222 at the beginning and end, respectively, of 1977. We also note that the evidence contains several dozen checks drawn on the ROLP account payable to Mr. Manchester, petitioner, or "Cash." We are unable to discern which of these checks were used to pay ROLP bills and which may have been used for other purposes. In short, we are unconvinced that all the checks in evidence were used, as petitioner asserts, for ROLP purposes, and we are unsure what amounts may have been partial repayments of the many advances to the corporation. We therefore shall accept the amount of the shareholder loans reported on ROLP's June 30, 1977, income tax return as being the net amount *299 of petitioner's advances to and distributions from ROLP as of that date. [29] To that amount we shall add the amounts of checks drawn [30] by petitioner for ROLP purposes from July 1, 1977, until the cessation of business at the end of 1977. We also shall subtract from petitioner's basis any checks payable to her from ROLP during that period. We shall not decrease petitioner's ROLP loss by any amounts for assets "distributed" to petitioner because we are not convinced that those assets had significant value or did more than "rot on the lot." To the extent the inventory or the vehicles had any value upon distribution, we feel that the value was more than eclipsed by petitioner's *300 payments for ROLP over the years that we have not included in her basis. [31] We therefore find that an approximation of petitioner's loss from the worthlessness of ROLP's stock is as follows: Initial incorporation
$ 225,000.00
Loans per 6/30/77 tax return
643,904.00
Petitioner's payments to ROLP after 6/30/77
163,422.56
Penn Fishing payments to ROLP after 6/30/77
60,357.00
Petitioner's payments to miscellaneous
payees after 6/30/77petitioner     [32] *301 19,577.85
Less: Basis deducted on 1970 return
(26,000)  S corporation losses       (151,172)  ROLP payments to petitioner after       6/30/77          (15,500)  [33] $ 919,589.41 Carrybacks and Carryforwards
On account of our findings with respect to the loss on ROLP stock, we must address petitioner's alternate argument that she is entitled in 1977 to use carryforwards and carrybacks from other years. Our decision on this issue is complicated by the fact that, until the eve of trial, both petitioner and respondent apparently did not fully focus on petitioner's reporting of the carryforwards on her 1977 return. Our task is further complicated by the fact that neither party has provided us with any authority that we consider relevant in our resolution of this issue. Nevertheless, we shall roll up our sleeves *302 and proceed to the matter at hand. For the sake of brevity, we shall combine our findings of fact and opinion on this issue. On her 1977 individual income tax return, petitioner reported carryforwards of net operating losses ("NOL") and investment tax credits ("ITC") as follows: Year Arose
Unused NOL
Unused ITC
1972  --
$ 4,709
1974  $ 208,860
789    1975  52,619   --     Total Available for 1977
$ 261,479
$ 5,498
Amount used on 1977
return as filed   $ 35,140 -0-     The NOL of $ 35,140 reduced petitioner's 1977 taxable income to zero. The return reported that the remaining NOL of $ 226,339 was available for carryforward to 1978. None of the available ITC carryforwards were used on the return because the reported tax liability was already zero. On her 1978 and 1979 individual returns, petitioner reported additional NOLs arising in those years in the amounts of $ 90,571 and $ 198,720, respectively. [34] *303 The amount of deficiency determined in the notice of deficiency was computed by calculating the amount of capital gain without regard to any claimed loss from ROLP stock, and by decreasing petitioner's income by $ 750 to reflect a personal exemption available to her. Tax was then computed on that amount of income. The Statement-Income Tax Changes and the attached Explanation of Items that were included in the notice of deficiency make no mention of the carryforwards reported on the return. Attached to the notice of deficiency was a Form 4625 - Computation of Minimum Tax, which was used to compute an amount of minimum tax that was included in the calculation of the amount of the deficiency. Line 11 of the Form 4625 provides, "Enter amount of any 1977 net operating loss carryforward to 1978 (attach statement showing computation)." On line 11 of the Form 4625 prepared by respondent and attached to the notice of deficiency was entered "226,339," *304 the dollar amount of the excess available NOL reported on petitioner's original return. That amount was used by respondent in his computation of the minimum tax included in the amount of the deficiency. In short, the amount of the deficiency computed in the notice of deficiency was computed taking into account an NOL for 1977 of $ 35,140 and an NOL carryforward from 1977 to 1978 of the additional $ 226,339. The original petition did not mention carryforwards or carrybacks of NOLs and ITCs. Petitioner filed a motion to amend her petition shortly before the date of trial. At trial, we granted petitioner's motion on the condition that she offer no evidence in support of the motion other than such evidence as would otherwise have been offered with respect to the issues in the case. Petitioner's amended petition asserted that she was entitled to unused NOL carryforwards "as reflected on her 1977 return in the amount of $ 226,339, and unused investment tax credits in the amount of $ 5,498." Petitioner also alleged her entitlement to "unused carryback losses from [Alert] and [PDI], both S corporations from the years 1978, 1979 and 1980, as reflected on those returns * * *." In his answer *305 to the amended petition, respondent generally denied petitioner's assertions. Petitioner recognizes the basic concept that a statutory notice of deficiency carries a presumption of correctness that, except where provided in the Code or the Tax Court Rules, places on her the burden of proof and the burden of going forward with the evidence. Foster v. Commissioner,80 T.C. 34, 228 (1983), affd. in part and revd. in part on another issue 756 F.2d 1430 (9th Cir. 1985); Llorente v. Commissioner,74 T.C. 260, 263-264 (1980), revd. in part 649 F.2d 152 (2d Cir. 1981). See also Welch v. Helvering,290 U.S. at 115. Petitioner argues, however, that respondent has the burden to show petitioner's disentitlement to the NOLs and ITCs because respondent did not specify his disallowance of the NOLs and ITCs in the statements or explanation attached to the notice of deficiency. Respondent concedes the allowances of the $ 35,140 NOL; however, he argues that his determination of the amount of the deficiency implicitly disallowed the ITCs and any additional NOL because the amount of the deficiency is computed without allowing a deduction for any additional NOL and without allowing any reduction in *306 tax for the ITCs. We agree with respondent on this issue. "The notice [of deficiency] is only to advise the person who is to pay the deficiency that the Commissioner means to assess him; anything that does this unequivocally is good enough." Olsen v. Helvering,88 F.2d 650, 651 (2d Cir. 1937). Respondent need not explain how the deficiencies were determined for a notice of deficiency to be valid. Scar v. Commissioner,814 F.2d 1363, 1367 (9th Cir. 1987), revg. on other grounds 81 T.C. 855 (1983); Campbell v. Commissioner,90 T.C. 110, 115 (1988). The notice only must (1) advise the taxpayer that respondent in fact has determined a deficiency, and (2) specify the year and amount. [35]Campbell v. Commissioner, supra,Foster v. Commissioner, 80 T.C. at 229-230. The notice of deficiency herein certainly provides that information. As we stated in Foster v. Commissioner, 80 T.C. at 230: Petitioners do not cite any case in *307 support of their position that the burden of proof is shifted to respondent if he fails to identify in the notice of deficiency the specific expenditures which are disallowed. We have previously considered similar contentions and rejected them. See, e.g., Pietz v. Commissioner, [59 T.C. 207, 213-214 (1972)]; Mayerson v. Commissioner, [47 T.C. 340, 348 (1966)]; Barnes Theater Ticket Service, Inc. v. Commissioner, T.C. memo. 1967-250, affd. sub nom. Barnes v. Commissioner,408 F.2d 65, 68 (7th Cir. 1969). We can see no reason to take any different position here. [Fn. ref. omitted.] Although the Foster Case spoke in terms of shifting the burden of proof and the issue before us is couched in terms of which party has the ultimate burden of persuasion, we think Foster is sufficiently analogous to the instant case. We similarly have been presented with no grounds to find that respondent has the burden of proof in the instant case. Even though the notice of deficiency made no specific mention of carryforwards or carrybacks of NOLs or ITCs, the computation of the amount of the deficiency is tax included no allowance of ITCs or of NOLs in excess of $ 35,140. The computation of the deficiency *308 was such that an inspection by petitioner or her representatives would have revealed the implicit disallowance of the ITCs and additional NOLs; [36] the calculation of the deficiency certainly does not mislead anyone who compares the notice of deficiency to the return filed for 1977. [37] The absence of any reference to the NOLs or ITCs in the Explanation of Items is not sufficient reason to cause respondent to have the burden of proof with respect to the carryforwards and carrybacks. We therefore hold that petitioner has the burden of proof. The *309 only evidence contained in the record regarding the existence of available ITCs and NOLs are tax returns from the years in which the NOLs or ITCs allegedly arose. The returns alone obviously are inadequate to sustain petitioner's burden of proof on disputed items such as the ITCs and NOLs herein at issue. Roberts v. Commissioner,62 T.C. 834, 839 (1974); Jones v. Commissioner,25 T.C. 110, 1104 (1956); revd. in part on another issue 259 F.2d 300 (5th Cir. 1958); Holle v. Commissioner,7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949), cert. denied 388 U.S. 949 (1950). We therefore find petitioner has failed to prove her entitlement for 19977 to carryforwards and carrybacks of ITCs and NOLs. Rule 142(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioner was also married to a Mr. Egly for a few years, apparently during the 1950's, and she is his widow. 2. Herbert Henze was still the president of Penn Fishing when the trial of this case took place. ↩
3. The transaction was not reported as an installment sale. ↩
4. The 100,000 shares represented approximately 13.5 percent of the outstanding Erie stock. The agreement for the sale of the 100,000 shares also provided that petitioner and Mr. Manchester would become the sole trustees of the Voting Trust through which the stock of the other principle Erie shareholders were controlled. 5. The rights to the patents had been assigned to ROLP as an initial contribution to capital when ROLP was incorporated. ROLP's policy apparently was to vest in the name of petitioner the ownership of all patents used by ROLP; petitioner appears to have been, in effect, a constructive trustee, holding the patents for ROLP. This policy seems to have been based on the understanding by the ROLP employees and shareholders (as evidenced by their testimony) that corporations may not apply for or own patents, although no authority has been cited for that proposition. Our understanding of patent law is that the individual inventor generally must file the actual application for the patent; however, the inventor may assign all his rights in the patent to another (such as his employer) even before making the patent application. 35 U.S.C. secs. 111, 152 (1982). See generally Chisum, Patents, secs. 2.03(2) and 11.02(2)↩ (1987). 6. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code of 1954, as in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
7. The tax returns for the years of 1967 through 1971 are not in evidence, and the parties were unable to produce copies of returns for those years. Frederick Levy, a partner in the accounting firm of Touche Ross & Co., noted that there were years in which ROLP apparently did not file tax returns. From time to time since 1968, Mr. Levy has represented petitioner, Penn Fishing, and other corporations in which she was involved. ↩
8. The parties stipulated that petitioner's distributable share of the loss as reflected in the ROLP tax return was $ 180,227. That return, however, accurately computes petitioner's share of ROLP's income and losses as "93.5% x (189,713) = (177,382)." Petitioner's individual return also reported a loss from ROLP of $ 177,382, so we disregard the amount set forth in the parties' stipulation and find that $ 177,382 was the amount of loss reported on the returns of both petitioner and ROLP. See Jasionowski v. Commissioner,66 T.C. 312, 318↩ (1976). 9. The tax returns for 1975, 1976, and 1977 report the loans outstanding as "estimated" amounts. As noted in footnote 7, supra,↩ no returns are in evidence for the 1967-1971 years, and no balance sheet from any of those years is in evidence. The 1972, 1973, and 1974 ROLP returns did not include balance sheets. 10. Nothing in the record explains why the returns reflected petitioner as acquiring the stock in 1967 when Walter did not transfer it until 1968. We surmise, however, that when the accounting firm of Touche Ross & Co. began preparing the Alert tax return in 1971, the acquisition date of petitioner's stock was estimated because it would have no effect on the returns in the 1970's. We have no indication as to how petitioner acquired ownership of the Alert stock from ROLP. We note also that petitioner's disposition of 200 Alert shares in 1975 was not reflected on her 1975 individual tax return. ↩
11. See United States v. Rad-O-Lite of Philadelphia, Inc.,612 F.2d 740, 741↩ (3d Cir. 1979). The Third Circuit makes no mention of Mr. Manchester's being indicted or convicted or subscribing to a false tax return; however, the parties stipulated as a fact that he was. 12. Mr. Manchester's actions comport with the overall canvas of Mr. Manchester and ROLP painted by the record in this case. Specifically, Mr. Manchester was a zealous, indefatigable eternal optimist in his belief in and promotion of ROLP equipment. In ROLP's appeal of the conviction, the Third Circuit noted, "Neither side suggested that Manchester's actions were outside of his responsibilities as vice-president and chief operating officer or taken for his own rather than Rad-O-Lite's benefit." United States v. Rad-O-Lite of Philadelphia, Inc.,612 F.2d at 742-743↩. 13. Petitioner had disregarded the advice of Mr. Levy and others that ROLP should declare bankruptcy. ↩
14. Petitioner's son noted that petitioner received from ROLP only a "dividend of headaches." ↩
15. There is no indication that any physical count of the inventory was made on or near the date of December 31, 1977. ↩
16. For a more thorough discussion of the changes in technology in the industry, see generally Preemption Devices, Inc. v. Minnesota Mining and Manufacturing Co.,559 F. Supp. 1250, 1254, 1261-1262 (E.D. Pa. 1983), affd. 732 F.2d 903↩ (Fed. Cir. 1984). In that case Preemption Devices, Inc., another corporation owned by petitioner and Mr. Manchester and discussed in more detail herein, was contesting the patent rights of "3M Company" for a type of traffic control device. 17. Mr. Manchester later transferred his 20 shares to petitioner in October 1979. ↩
18. The chief engineer for ROLP/PDI testified that he could not remember what year the focus of the business changed from preemption to phase selection, but he emphasized that "When the uniform traffic control manual was changed, we went into phase selection." The Manual on Uniform Traffic Control Devices for Streets and Highways, which is published by the Federal Highway Administration, was amended in 1978. The 1978 edition superseded the 1971 edition and remains in effect with minor revisions. 19. Mr. Manchester instead loaned (and later gave) the trucks to one of the former Erie stockholders because they were "rotting away on the lot." ↩
20. We do not discuss petitioner's liquidation argument because she has not shown that her realized loss, net of distributions, would be any larger under section 331. 21. A significant portion of the funds advanced to or on behalf of ROLP by petitioner was treated as "Loans from Shareholders" on the balance sheets that were prepared from time to time for ROLP. Respondent asserts, and petitioner does not dispute, that the payments constituted equity, rather than indebtedness, for purposes of Federal taxation. We agree and have no doubt that the payments designated as "loans" were truly capital contributions. Thus, petitioner is entitled to a basis in her ROLP stock to the extent she shows that she actually advanced funds to ROLP, regardless of the designation of the payments on the balance sheets. 22. See also Hawkins v. Commissioner,T.C. Memo. 1987-91↩. 23. See Thun v. Commissioner,T.C. Memo. 1977-372↩. 24. See Duncan v. Commissioner,T.C. Memo. 1986-122↩. 25. Respondent also suggests that PDI's use of the triangular logo formerly used by ROLP shows that ROLP still had value. We do not agree and find that any value associated with the ROLP logo was only nominal, and certainly not sufficient to cause ROLP to have potential value. More likely, petitioner and Mr. Manchester did not take the effort to come up with another distinctive symbol for PDI to use. 26. See also Cedrone v. Commissioner,T.C. Memo. 1986-89↩. 27. Petitioner also argues that the various amounts paid by her in exchange for interests in Erie stock are includable in her ROLP basis. We have found that none of the Erie stock was ever owned by ROLP, so payments therefor are not properly includable as contribution to ROLP capital. Erie and ROLP were separate entities and must be recognized as such. Moline Properties, Inc. v. Commissioner,319 U.S. 436, 439↩ (1943). Deductions for her basis in Erie stock were properly allowable when the Erie stock became worthless, apparently in 1965 or 1966. 28. We do not decrease petitioner's basis by $ 177,382 -- petitioner's share of ROLP's 1974 loss. We acknowledge that section 1376(b)(1) (currently in effect as section 1367(a)(2)) required a decrease in the basis of stock for the amount of flow-through losses; however, we are not now determining petitioner's actual basis in her ROLP stock. We only are making a reasonable approximation of the quantum of her basis in the ROLP stock, and we decline to lower her basis in the amount of $ 177,382, especially in view of our decision herein disallowing petitioner's use of $ 226,339 of net operating loss carryforwards attributable in part to the 1974 ROLP loss. ↩
29. Petitioner was the only shareholder by 1977. We accept the testimony of the several witnesses that Mr. Manchester had few, if any, assets and that the funding for ROLP came from petitioner and not from Mr. Manchester, even though Mr. Manchester was the ROLP general manager, primary salesman, "chief cook and bottle washer." ↩
30. Petitioner appears to have used much of the cash she received upon the sale of her Penn Fishing stock to pay off ROLP creditors, either directly or through cash contributions to the corporation. ↩
31. Although we suspect that petitioner over the years made contributions to ROLP's capital which were not intended as "shareholder loans," no Paid-in Capital was reported on the balance sheets included with the tax returns. ↩
32. We have not included the total amounts of the post - 6/30/77 checks on Exhibit 75-BW because some of the payments appear to be on behalf of Alert. We have included in petitioner's ROLP basis only half of the amounts paid to Clemence Shearer, Mr. Kohn, and American Bureau Collection because these payees performed work for both Alert and ROLP. We have excluded a check written to Bell Telephone because it appears to be for the phone lines used by the alarms operated by Alert for which deductions were taken on Alert's tax return. 33. We appreciate that petitioner was taxed in 1977 on the relief of loans in the amount of $ 1,742,000 by virtue of the transaction in which she sold her Penn Fishing stock. When added to $ 843,222 (December 31, 1977, loans from shareholders as represented on the Alert tax return), however, the ROLP loss we have allowed petitioner exceeds the amount of loans of which she was relieved.↩
34. The NOLs in those years were caused by the flow through to petitioner or claimed subchapter S losses from Alert and PDI. Petitioner also asserts that the 1980 subchapter S corporation losses for Alert and PDI caused her to generate an individual NOL for 1980. Her 1980 individual income tax return is not in evidence, however, and she has offered no indication as to the amount of any 1980 NOL, if indeed she had an NOL in 1980. We therefore deem her to have conceded that she is not entitled to a carryback to any NOL arising in 1980. 35. There is no suggestion by petitioner that respondent failed to make a determination of a deficiency for petitioner for 1977, that the notice of deficiency herein was not a valid deficiency determination, or that respondent's determination was arbitrary and capricious. ↩
36. If a notice of deficiency does not adequately indicate the specific items disallowed by respondent, our Rules provide a mechanism by which taxpayers may ascertain the specific disallowances. See Campbell v. Commissioner,90 T.C. 110, 115 (1988); Foster v. Commissioner,80 T.C. 34, 230-231↩ (1983). 37. This Court normally does not look behind a notice of deficiency ( Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 328↩ (1974)); however, we suspect that if petitioner had brought the issue of the NOLs and ITCs to the attention of the examining agent, the notice of deficiency would have specifically addressed their allowance or disallowance.